627 So.2d 1289 (1993)
Kelly HOSEY, Appellant,
v.
STATE of Florida, Appellee.
No. 92-1545.
District Court of Appeal of Florida, Fifth District.
December 10, 1993.
James B. Gibson, Public Defender, and Daniel J. Schafer, Asst. Public Defender, Daytona Beach, for appellant.
Robert W. Butterworth, Atty. Gen., Tallahassee, and Myra J. Fried, Asst. Atty. Gen., Daytona Beach, for appellee.
HARRIS, Chief Judge.
Kelly Hosey rushed to board a train in Miami in a manner that caused a police officer to become suspicious that she might be a drug courier. Although it was too late for him to board the train, the officer telephoned the Volusia County Sheriff's Department and explained his suspicion. Acting on this tip, Deputies Crawford, Gambrell and a third officer boarded the train at a later stop in DeLand. They found Hosey in a sleeping compartment  a small room with a door. It was approximately 11:00 p.m. when the officers knocked on the door of Hosey's compartment.
Although the testimony was in conflict, Deputy Crawford testified that the three officers went to the train station to see if Hosey would agree to talk to them. When Hosey answered their knock, Crawford identified himself as a Volusia County Narcotics officer. He asked for identification and then requested Hosey's consent to search the compartment and her luggage. The officers did not exhibit any weapons, nor did they suggest that they would arrest her or obtain a search warrant if she refused to give consent. Hosey consented to the search, which revealed in excess of 200 grams of cocaine wrapped in two plastic bags which were rolled up in a pair of socks.
Hosey moved to suppress the evidence of cocaine. The trial court, after hearing all the testimony and weighing the credibility of the witnesses, found that Hosey had voluntarily given consent:
I think that she did have a reasonable expectation of privacy but I think that she gave valid consent, but I don't think that the officers' conduct was unreasonable or outrageous or threatening.
*1290 The court denied the motion to suppress. Hosey pled no contest, reserving her right to appeal, which she has now done. We affirm.
The first question to ask on review is whether the court focused on the correct legal issue. We find that it did. The court found that Hosey freely consented to the search and that the deputies did not obtain this consent through police misconduct.
The next question is whether this determination finds support in the record. Hosey's consent was not invalidated by her expectation of privacy. Prior to obtaining her consent, the officers did nothing more than knock on the door of her compartment and ask to speak with her. It is not unlawful to knock on the door of even a private residence. The officers did not enter without first being given permission to do so. The existence of an expectation of privacy does not mean that consent cannot be given. That is precisely the reason consent is required. The only issue, therefore, is whether the record supports the trial court's finding that the consent was not coerced.[1]
The State relies on Florida v. Bostick, ___ U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), which we agree is controlling.[2] In that case, the court discussed the defendant's argument and the correct legal standard:
Bostick insists that this case is different because it took place in the cramped confines of a bus. Police encounter is much more intimidating in this setting, he argues, because police tower over a seated passenger and there is little room to move around.
* * * * * *
Bostick's freedom of movement was restricted by a factor independent of police conduct, i.e., by his being a passenger on a bus. Accordingly, ... the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter.
* * * * * *
We remand so that the Florida courts may evaluate the seizure question under the correct legal standard. We do reject, however, Bostick's argument that he must have been seized because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs. This argument cannot prevail because *1291 the "reasonable person" test presupposes an innocent person.
* * * * * *
Clearly, a bus passenger's decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant only if the cooperation is voluntary. "Consent" that is the product of official intimidation is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse. The question to be decided by the Florida courts on remand is whether Bostick chose to permit the search of his luggage.
___ U.S. at ___-___, 111 S.Ct. at 2386-2388. On remand, the Florida Supreme Court found that Bostick's consent was voluntary. Bostick v. State, 593 So.2d 494 (Fla. 1992).
The Bostick facts are very similar to those of the case at bar. Bostick was restricted to the "cramped confines" of a bus; Hosey was restricted to the cramped confines of a sleeping compartment. Just like Bostick, Hosey's freedom of movement was "restricted by a factor independent of police conduct." The only noteworthy factual distinction between Bostick and the instant case is that in Bostick the police officers specifically informed the defendant that he need not consent. And while such a statement would be persuasive (perhaps even conclusive) evidence that a seizure had not occurred, the law does not require such Miranda-like compliance in order to avoid the finding that a seizure has occurred. The Bostick court clearly indicated the focus of the inquiry is much broader:
[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter. (Emphasis added.)
Bostick, ___ U.S. at ___, 111 S.Ct. at 2389.
Notice that while this standard requires that the police do or say nothing to indicate that the individual approached is not free to refuse the request or to break off the encounter, it places no affirmative duty on the police to specifically inform such person that he is free to refuse the request or to end the encounter.
All Hosey needed to do in this case was to close her door. There is nothing in the record that refutes the trial judge's finding that the actions of the police did not suggest to Hosey that she could not close her door and terminate the encounter. The trial court found that she voluntarily elected to cooperate with the police and to permit the search. There is adequate record support for this conclusion.
AFFIRMED.
THOMPSON, J., concurs.
PETERSON, J., dissents, with opinion.
PETERSON, Judge, dissenting.
I respectfully dissent. The majority has leap-frogged the most important analytical step by ignoring the issue whether Hosey was unlawfully seized before she "consented" to the search. In Florida v. Bostick, ___ U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the case upon which the majority relies, even the United States Supreme Court considered the issue of seizure to be one of such importance that the case was remanded for a determination whether a fourth amendment seizure had occurred. The issue whether a seizure occurred must be analyzed before the question of consent can be considered. Here the majority dispenses with the seizure issue merely by stating, "[i]t is not unlawful to knock on the door of even a private residence."
In Bostick the Supreme Court reiterated that consensual encounters in public places do not implicate a fourth amendment interest. Further, even when police have no basis for suspecting an individual they may generally question the individual, ask to examine the individual's identification and request consent to search the individual's luggage  "as long as the officers do not convey a message that compliance with their requests is required." Id., ___ U.S. at ___, 111 S.Ct. *1292 at 2388 (emphasis added). A seizure has taken place if the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. See, Id., ___ U.S. at ___, 111 S.Ct. at 2389. In Bostick, as in the instant case, the police lacked the probable cause or the reasonable suspicion required to justify a seizure.
In Bostick, uniformed police officers, one of whom carried an encased weapon, boarded a bus at an intermediate station. Standing between the defendant and the exit, and partially blocking the aisle, they asked to inspect the defendant's ticket and identification. The papers were returned to him as unremarkable. The police then explained that they were narcotics agents on the lookout for drugs and asked to search the defendant's luggage. The defendant was informed of his right to refuse consent. The Florida Supreme Court held that the circumstances amounted to an illegal seizure and noted the comments of a trial court in a similar case:
"`[T]he evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the government. The spectre of American citizens being asked, by badge-wielding police for identification, travel papers  in short a raison d'etre  is foreign to any fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward County, Florida, these police officers approach every person on board buses and trains ("that time permits") and check identification [and] tickets, [and] asked to search luggage  all in the name of "voluntary cooperation" with law enforcement....'" 554 So.2d at 1158, quoting State v. Kerwick supra, at 348-349 (quoting trial court order).
Id., ___ U.S. at ___, 111 S.Ct. at 2391 (Marshall, J., dissenting) quoting Bostick v. State, 554 So.2d 1153, 1158 (Fla. 1989) quoting State v. Kerwick, 512 So.2d 347 (Fla. 4th DCA 1987).
A divided United States Supreme Court reversed in Bostick based on the perceived rigidity of our supreme court's holding that "an impermissible seizure result[s] when police mount a drug search during scheduled stops and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers' luggage." Id., ___ U.S. at ___, 111 S.Ct. at 2385 quoting 554 So.2d at 1157. The Court perceived the Florida court's holding to be a per se rule that, although police may approach persons at random in most public places, ask them questions, and seek consent to search, they may not engage in the same behavior on buses. Id. The Supreme Court noted that the place where the encounter takes place is not dispositive; all of the circumstances surrounding the encounter must be taken into account. Id., ___ U.S. at ___, 111 S.Ct. at 2387.
In the instant case, the majority mischaracterizes the encounter when it states that the officers "did nothing more than knock on the door of [Hosey's] compartment and ask to speak to her." Hosey was travelling alone in a tiny sleeping compartment approximately three feet by six feet in dimension. When the train stopped in DeLand, three deputies boarded the train. Hosey, partially undressed, was lying abed when the deputies knocked on her door. When she opened it, she was confronted by three officers standing in the narrow passageway outside the door. One of the officers was a six foot two inch male weighing 260 pounds, and another officer was a five foot nine inch female weighing 155 pounds. The third deputy had to leave his dog in a patrol car because of the crowded conditions of the passageway. It would have been impossible for the deputies to enter the room because most of the area was occupied by the bed. One of the officers identified himself to Hosey as a narcotics officer and told her that he had information that she might be in possession of narcotics. He asked her for and received an identity paper. He then asked to search the compartment and her luggage. One of the officers testified that Hosey responded, "Sure." The officer testified that Hosey appeared to *1293 be nervous; she was looking around, she spoke softly, and her hands were shaking.
The facts of the instant case are thus more extreme than the facts in Bostick. Hosey, unlike the defendant in Bostick, was not told of her right to refuse consent. The Bostick court felt it "particularly worth noting" that the defendant was advised that he had the right to refuse consent. Id., ___ U.S. at ___, 111 S.Ct. at 2385. Unlike the defendant in Bostick who was surrounded by other passengers, Hosey was held in isolation in partial dress in the middle of the night by the three officers crowding her doorway. Unlike the defendant in Bostick who was told that police were "on the lookout for drugs", Hosey was told that she was a suspect in a criminal investigation, to wit: possession of drugs. Finally, unlike the defendant in Bostick, who was at least seated in a public area, Hosey was in bed in a private sleeping compartment  a home away from home  and had a heightened expectation of privacy resulting in a heightened degree of intrusion.
I would hold that the circumstances surrounding this encounter  the fact that it took place in a private sleeping compartment of a train, the accusatory statement, the request for identity papers, the presence of the three officers in the small, isolated and confined area in the doorway, and the lateness of the hour  were so coercive and intimidating that Hosey was "not at liberty to ignore the police presence and go about [her] business." Bostick, ___ U.S. ___, ___, 111 S.Ct. 2382, 2387. I would hold that this encounter constituted a seizure because, considering all of the circumstances, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Id., ___ U.S. at ___, 111 S.Ct. at 2389.
Although the facts of the instant case are far afield of those in Bostick, they are very similar to those in Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987). There the court held that an illegal seizure occurred when three officers boarded the sleeping cars of a train to conduct a drug sweep. The officers knocked on the door of the private compartment occupied by Alvarez, who was lying in bed in his stocking feet. After Alvarez opened the door, the officers positioned themselves in the doorway, partially blocking the exit, and identified themselves. They requested Alvarez's train ticket and identification, explained that they were looking for persons who were illegally transporting drugs, and requested permission to search his luggage. Consent was given and a package of cocaine was found. The Alvarez court held that the encounter was an unconstitutional seizure, noting the closeted circumstances, the coerciveness of a request for identification, and the fact that a person who reserves a private berth in a sleeping car has the right to expect to be free from police intrusion. Id. at 290.[1] In the instant case, as in Alvarez, the encounter was a fourth amendment seizure without probable cause or reasonable suspicion and the denial of Hosey's motion to suppress was correct only if the taint of the illegal seizure had been dissipated by the time she gave her "consent."
With respect to consent, the Alvarez court observed that the state has the burden to prove legal justification for any search conducted without a warrant and that, when consent is relied upon for justification, the state must prove that the consent was freely and voluntarily given as an independent act of free will and not mere acquiescence to police authority. Id. at 288. The court further noted where there is antecedent police misconduct the state must prove the consent by clear and convincing evidence. Id. The purpose of this rule, the court continued, is to place the burden on the state to demonstrate an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official action. Id. Because the court found a lack of such clear and convincing evidence the court held that the motion to suppress *1294 should have been granted. In the instant case there is nothing in the record showing a removal of the taint of the illegal seizure. Because the encounter was a fourth amendment seizure without probable cause or a reasonable suspicion, and because the taint of the illegal seizure had not been removed, Hosey's motion to suppress should have been granted.
In Bostick, the Court focused myopically when it said, "If [the war on drugs] is to be fought, those who fight it must respect the rights of individuals, whether or not those individually are accused of having committed a crime." Id., ___ U.S. at ___, 111 S.Ct. at 2389. It is easy to lose focus in cases like this where an apparently guilty person will likely go free if it is determined that "the constable blundered." See People v. Defore, 242 N.Y. 13, 150 N.E. 585, cert. denied, 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784 (1926); Cf. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, reh. denied, 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961). It is especially easy to lose focus when the contraband seized is so destructive of individuals and society, and when the amount seized suggests that the poison was intended to be spread.
Nevertheless, the focus must remain on the Constitution. United States citizens are guaranteed the right to be "secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Art. IV, U.S. Const. "[I]t was one of the primary aims of the Fourth Amendment to protect citizens from the tyranny of being singled out for search and seizure without particularized suspicion notwithstanding the effectiveness of [the] method." Bostick, ___ U.S. at ___, 111 S.Ct. at 2389 (Marshall, J., dissenting). The purpose of the exclusionary rule  the rule requiring suppression of illegally obtained evidence  is to preserve these rights for all United States citizens. "The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp, 367 U.S. at 659, 81 S.Ct. at 1694, 6 L.Ed.2d 1081 (1961). If the police can violate the rights of a person later determined to be guilty, they can violate the rights of any citizen. The decisions of appellate courts are applied broadly and the rights of our citizenry should not be diminished in order to convict Hosey of drugs found in violation of constitutional guaranties. Law enforcement officers fight at the front line of the war against drugs, but police misconduct, no matter the degree to which it arises out of zeal and dedication, cannot be countenanced.
With this opinion, based upon the defendant's so-called consent, the majority countenances misconduct that was highly intrusive and highly coercive. If the majority is correct in extending Bostick to the circumstances of this case, then Bostick can be extended to an investigative contact in any setting including a private residence. Anywhere, anytime, day or night, without even a reasonable suspicion, courtesy of the majority opinion, the citizens of Florida can be roused by a group of police officers on a fishing expedition for contraband and asking for "voluntary" consent to a search of the home. By its opinion, the majority places the final nail in the coffin of a citizen's expectation of privacy and brings to reality the fear expressed in U.S. v. Lewis, 728 F. Supp. 784, 788-89, reversed, 287 U.S.App.D.C. 306, 921 F.2d 1294 (1990):
In this "anything goes" war on drugs, random knocks on the doors of our citizens' homes seeking "consent" to search for drugs cannot be far away. This is not America.
If the citizens of this state, and others who travel in it, must endure suspicionless drug sweeps, random or otherwise, that are conducted in their homes and other places in which they have a heightened expectation of privacy, then I would follow the lead of the dissent in Bostick. I would hold that, in circumstances like the instant case, the taint of the illegal seizure cannot be dissipated without the individual being informed of the right to decline to be questioned "to dispel the aura of coercion and intimidation that pervades such encounters." Bostick, ___ U.S. at ___, 111 S.Ct. at 2394-95 (Marshall, *1295 J., dissenting).[2] Surely, advising an individual of his right to refuse consent and terminate the encounter would not place an unreasonable burden on the government. The exercise of the right to refuse to cooperate would simply place on the police the timehonored requirement that the police obtain a search warrant upon probable cause. It would also tend to lessen the burden on the courts to conduct lengthy hearings in order to determine whether voluntary consent was given.
I would hold that Hosey was illegally seized as a matter of law and that no dissipation of the taint existed which could have justified the subsequent "consent." Accordingly, I would hold that the trial court erred in denying the motion to suppress.
NOTES
[1] The record adequately supports the trial court's finding that there was no illegal police action  no invalid detention or arrest or illegal search:

Officer Harold Crawford:
Q. When you wanted to contact her, what was going to be your approach?
A. All we could do is just go up and ask her if she would talk to us.
Q. If she had not talked to you, what would you have done?
A. Wasn't much else we could do but leave.
* * * * * *
A. Well, she opened the door and I identified myself as who I was, she opened the door when we knocked.
Q. Did you order her to open the door?
A. I did not.
Q. Once she opened the door, did you show her any credentials?
A. Yes, I did.
* * * * * *
Q. What else did you say?
A. I went ahead and identified myself as a Volusia County narcotics officer and asked to see some identification. And went on to explain to her that we had received a phone call that she might be carrying illegal narcotics.
Q. All right. What else did you say to her?
A. Then I asked for her consent or asked her if she would talk to me and she said sure.
Q. And what else?
A. I then asked if I could search her compartment and her luggage.
Q. Is that how you put it? Are those the words that you used?
A. Yes, ma'am.
Q. And what was her response to that?
A. She said sure.
The officer never entered her compartment until her consent was given. We find the officer's conduct not only legal but most appropriate.
[2] Hosey suggests that perhaps the Bostick holding relating to the proper standard for determining whether a seizure has occurred is applicable only to those cases in which the encounters are random. We disagree. If a valid consent is obtained, it does not matter if the request was based on a random inquiry or based on suspicion less than probable cause. The issue is not why the request was made but rather whether the consent was freely and voluntarily given.
[1] The court further noted that the defendant did not feel free to leave because he had already purchased a ticket and begun his journey. In Bostick, the Supreme Court stated that in a situation involving a passenger on a bus the relevant inquiry is whether the individual felt free to decline the officers' requests or otherwise terminate the encounter. Bostick, ___ U.S. at ___, 111 S.Ct. at 2387.
[2] The taint of the illegal seizure will not necessarily be removed by the giving of such a warning. "[I]t is not the presence or absence of any one factor alone that determines the validity of a consent." Reynolds v. State, 592 So.2d 1082, 1087 (Fla. 1992) (where defendant was handcuffed, fact that defendant was told that he had right to refuse consent did not make consent voluntary).