865 So.2d 584 (2004)
Lynn MILLER, Appellant,
v.
STATE of Florida, Appellee.
No. 5D02-3101.
District Court of Appeal of Florida, Fifth District.
January 9, 2004.
Rehearing Denied February 19, 2004.
*585 Steven G. Mason, of Law Office of Steven G. Mason, Orlando, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Angela D. McCravy, Assistant Attorney General, Daytona Beach, for Appellee.
TORPY, J.
The issue in this case is whether Appellant's actions in stopping, talking to police, permitting police to enter her home and in surrendering a small quantity of drugs were objectively voluntary acts or mere acquiescence to police authority. The lower court determined that Appellant's acts were voluntary and denied her motion to suppress the drugs. We conclude, based upon the totality of the circumstances, that a reasonable person would have felt compelled to comply with the officers' requests, and that Appellant's encounter with police amounted to an unlawful seizure within the contemplation of the Fourth Amendment to the United States Constitution. Therefore, we reverse the order that denied Appellant's motion to suppress.
We accept the trial court's findings of fact because there is substantial competent evidence to support them. However, our application of the law to the facts, including our determination of whether Appellant's consent was objectively voluntary, is de novo. State v. Glatzmayer, 789 So.2d 297 (Fla.2001); Taylor v. State, 848 So.2d 1191 (Fla. 5th DCA 2003).
On February 24, 2001, the Orange County Sheriff's Office received via telephone an anonymous tip that unnamed individuals at 3812 Edland Drive were involved in narcotics activity. The tip was referred to a special "tip squad," which is assigned to investigate such complaints using a tactic known as "knock and talk." This is a tactic used when information about a suspect is *586 not sufficient to support the issuance of a search warrant. Instead of simply ignoring the complaint, the "tip squad" goes to the location of the alleged criminal activity, in this case a house, and attempts to obtain consensual entry and permission to search.
It was not until March 14, 2001, that officers from the "tip squad" commenced to perform a "knock and talk" upon Appellant's residence at 3812 Edland Drive. No new information was received in the three weeks since the tip was received. Shortly after noon on the 14th, three agents arrived simultaneously at Appellant's home. They approached her just as she and a male companion were leaving the residence to run some errands. The officers were wearing gun belts and black smocks that displayed the words "Orange County Sheriff's in conspicuous letters. One of the officers, Deputy Alvarado, encountered Appellant and her companion, who by this time were halfway between the house and Appellant's car. The other officers positioned themselves at the edge of the driveway in the street where their presence could be observed by Appellant. After displaying his credentials, Alvarado told Appellant that he was there to investigate a complaint and asked her if she lived at the residence. Appellant replied "yes," but told Alvarado that she was leaving. Alvarado then told Appellant that his inquiry would not take long but that he "needed to speak with her reference some possible drug activity." Alvarado also told Appellant it would be better if she went inside so that neighbors would not see the investigation taking place. She acquiesced. Although Alvarado told Appellant that he did not have a search warrant, he never told her that she had a right to refuse to cooperate.
Alvarado and another agent followed Appellant inside the residence. The third agent suggested that her companion wait outside with him. Once inside the residence, Alvarado asked Appellant for her identification, which he retained in his possession throughout the ensuing colloquy. He then told her that he was there to investigate narcotics activity, that he had information that cannabis had been smoked in the house, and he asked her if there were drugs in the house. She replied in the affirmative. He then asked her to retrieve the drugs. She escorted the deputies to the bedroom where she retrieved a small amount of marijuana, a small piece of crack cocaine and a pipe from her purse. At that time, she began to cry, explaining to deputies how recent deaths in her family had led her to use the drugs. The deputies confiscated the drugs, searched no further, and left the residence without effecting an arrest. Appellant was later charged by information.
Although expressing some concern with the tactics of the police, especially with the failure of police to inform Appellant that she had the right to refuse their requests, the trial court denied the motion to suppress, expressing the belief that his decision was mandated by our decision in Hosey v. State, 627 So.2d 1289 (Fla. 5th DCA 1993). Although Hosey bears some similarity with the instant case, we do not find Hosey determinative of the instant case.[1]
The state concedes that the officers here did not have reasonable suspicion or probable cause, and a warrant could not have issued. The state further concedes that, had Appellant been driving away in her vehicle upon the arrival of police, the police could not have lawfully stopped her. *587 Because Appellant was encountered prior to reaching her vehicle, however, the state urges that the recovery of the drugs was the product of a mere "consensual encounter," wherein no reasonable suspicion or probable cause is required, citing Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).[2] For the reasons stated herein we find the state's argument to be untenable.
The state is correct that not every encounter with the police constitutes a seizure within the contemplation of the Fourth Amendment. Id. at 434, 111 S.Ct. 2382. Rather, a seizure only occurs when the police, "by means of physical force or show of authority, [have] restrained the liberty of a citizen." Id. Here, no physical force was used by police. Therefore, we must determine if a seizure occurred based on a "show of authority." This determination is made by consideration of the "totality of the circumstances" of the encounter. Id. at 439, 111 S.Ct. 2382. If the circumstances would cause a reasonable person to conclude that he or she is "not free to decline the officers' requests or otherwise terminate the encounter," then the encounter is a seizure requiring, at a minimum, reasonable suspicion as a prerequisite. Id.
Among the factors that the court should consider in its analysis are the place and time of the encounter, the number of officers, and the words and actions of the officers. United States v. Broomfield, 201 F.3d 1270, 1274 (10th Cir.2000); United States v. Glass, 128 F.3d 1398,1406 (10th Cir.1997). No one factor is dispositive. Id. Rather, it is the court's responsibility to consider all factors in the amalgam and reach the conclusion suggested by the "totality of the circumstances." Bostick, 501 U.S. at 439, 111 S.Ct. 2382. Here, our review of the relevant factors leads us to the conclusion that a reasonable person would not have felt free to decline the officer's requests.
The first factor, the place of the encounter, the front yard of Appellant's home, rather than a public place, militates against the state.[3]United States v. Griffin, 7 F.3d 1512, 1518-19 (10th Cir.1993). When confronted by police in a public place, a citizen may simply choose to ignore the police, secure in the belief that *588 further intrusion is unlikely because his or her identity is unknown by police. When the encounter occurs at a citizen's own residence, conversely, the citizen does not enjoy the anonymity of a random street encounter. Thus, the intrusion into the citizen's life involves not only a physical intrusion on the citizen's property but also the likely realization by the citizen that the government knows who he or she is and where he or she lives. This unsettling revelation is further exacerbated when, as here, the officers make clear to the citizen that he or she is the suspect in a specific criminal investigation. See Royer v. State, 389 So.2d 1007, 1018 (Fla. 3d DCA 1979), (indication that criminal investigation had focused upon defendant "provided another clear sign that he had in fact been taken into custody"), aff'd, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). See also Glass, 128 F.3d at 1406-07 (statements by police that indicate a particularized focus on individual as suspect in crime is factor suggesting seizure rather than consensual encounter). Although somewhat mitigated by the time of day, these circumstances certainly foster a more intimidating atmosphere in the mind of a reasonable person.
As to the number of officers, three, the State argues that three officers are necessary in these situations to ensure officer safety. We are not insensitive to this concern, but the issue is not the validity of the police purpose in choosing its manpower commitment. Rather, we must determine how a reasonable person would perceive three officers arriving at one's home, simultaneously, dressed as these officers were dressed. See Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 1847, 155 L.Ed.2d 814 (2003) (under objective test, "officer's motivation of self-protection does not speak to how their actions would reasonably be understood"). Obviously, this considerable show of authority was sufficient to create the perception that a major criminal investigation was underway. We think this circumstance would cause a reasonable person to feel less inclined to rebuff the officers' requests. U.S. v. Mendenhall, 446 U.S. 544, 554-555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (presence of "several officers" is circumstance that might indicate a seizure).
The final and perhaps most significant factor in this case, the words and actions of the officers, convinces us that the encounter was not objectively consensual. Although Appellant indicated that she was leaving when first approached, the officer persisted by stating that he "need[ed] to speak with her" regarding drugs and that it would not take long. Certainly, in this context, a reasonable person could conclude that the agent's "need" was based upon some bona fide authority to detain her, rather than a mere desire to follow up on a three-week-old, vague, anonymous tip. See Kaupp, 123 S.Ct. at 1847, 123 S.Ct. 1843 (where youth was roused from sleep, statement by police that "we need to go and talk" left no option but "to go"). Furthermore, after having dissuaded Appellant from leaving, the officer suggested that she accompany him into her home (allegedly out of concern for her, even though no neighbors were present). Thereafter, she was separated from her companion, who remained under observation by the third officer, and the officer retained her identification throughout the ensuing interrogation. See Golphin v. State, 838 So.2d 705 (Fla. 5th DCA 2003) (retention of license by police, although not per se seizure, is factor to be considered). We think that these words and acts by the police, together with the other circumstances of the encounter, would clearly lead a reasonable person to believe that compliance with the "requests" of the officers was required.
*589 As a final point, we wish to address a concern expressed by the trial judge. Had the officer told Appellant that she had the right to decline his requests, a different case might have been made by the state. Although the officer had no obligation to advise Appellant of her right to refuse, a simple warning might have eliminated any ambiguity caused by the officers' other words and acts. See Broomfield, 201 F.3d at 1274 (failure to advise of right to refuse is factor that court can consider in consensual encounter determination).
REVERSED.
PETERSON, J., concurs.
PALMER, J., dissents, with opinion.
PALMER, J.
I respectfully dissent.
Although the majority indicates that they accept the trial court's findings of fact because there is substantial competent evidence in the record to support them (as we are required to do), in reversing the trial court's suppression ruling the majority actually either disregards certain of those findings of facts or places an interpretation on testimony different from that placed by the trial court, thereby improperly reevaluating the credibility of the witnesses giving such testimony.
The most significant factual finding made by the trial court relates to the consensual nature of the initial encounter between the police officer and Ms. Miller. In that regard, the trial court factually found the following:
But I do find, from the evidence, that they encountered Ms. Miller. She was coming out of her home, they walked up, can we talk to you, she, according to the first witness, apparently said yes.
Given the court's other factual findings, including that no weapons were drawn, the police officer's tone was conversational, the officers did not block Ms. Miller's egress, and the officer told Ms. Miller that they did not have a warrant to search her home, the trial court's findings that Ms. Miller's actions were objectively voluntary, and not mere acquiescence to police authority, must be affirmed.[1]
In Taylor v. State, 855 So.2d 1 (Fla. 2003), our Supreme Court recognized the consensual nature of an encounter which showed far greater evidence of acquiescence to police authority than that which occurred in this case. In Taylor, deputies knocked on the door of Taylor's mobile home and someone answered the door and invited the officers to come in. After the officers entered the home, Taylor appeared and was observed removing something from his pocket and shoving it under the cushion of the chair where he was sitting. Taylor was handcuffed, placed in a squad car, and then asked for his consent to search the mobile home and his car. Taylor gave his consent and advised the police where they could find what they were looking for. Under those circumstances, the Supreme Court found that the consent given by Taylor was valid and therefore the evidence seized was not subject to suppression. The court noted:
... the initial contact Taylor had with the police on December 30, 1997 constituted a consensual encounter. We have recognized that "[t]he United States Supreme Court has defined a consensual encounter as one in which a reasonable person would feel free to disregard the *590 police and go about the person's business." Voorhees v. State, 699 So.2d 602, 608 (Fla.1997).
Id. at 15. The court in Taylor went on to state:
In Denehy v. State, 400 So.2d 1216, 1217 (Fla.1980), we held that "[u]nder ordinary circumstances the voluntariness of the consent to search must be established by a preponderance of the evidence." In analyzing whether a defendant's consent to a search is voluntary, a court should consider the totality of the circumstances around the granting of consent to the search. See Norman v. State, 379 So.2d 643, 646-47 (Fla.1980). When the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. See [Reynolds v. State, 592 So.2d 1082 (Fla.1992)]. In a situation where there is neither an illegal detention nor other illegal conduct by the plaintiff, as we have concluded in the instant case, the State must establish the voluntariness of the consent by a preponderance of the evidence. See Id. Here, the record reflects the State met its burden.
Id. at 17.
Similarly, here, the trial court had sufficient evidence before it to find that the State met its burden of establishing the voluntariness of Ms. Miller's consent. Accordingly, I would affirm.
NOTES
[1] The encounter in Hosey occurred on a public conveyance, not at the citizen's home. More importantly, in Hosey, the words and actions of the police were clearly less coercive.
[2] Appellant calls this a "knock and talk" case. The parties, accordingly, expend much argument on this issue by providing decisions from federal and state courts of other jurisdictions that have addressed the propriety of the so-called "knock and talk" tactic. Appellant urges that we declare this procedure to be a per se violation of the Fourth Amendment. Although no binding authority has been cited by either party, we have found no case, nor have the parties cited any to us, in which such a per se rule was adopted. Because we do not view this as a "knock and talk" case, we find it unnecessary to resolve this issue at this time.
[3] Appellant labels this area "curtilage" and suggests that entry upon this area without a warrant is a per se violation of the Fourth Amendment. We disagree. The area in question was readily visible from the adjacent public street. Although private property, it was not designated as such. Therefore, it was an area open to entry by salespersons, postal workers, meter readers and the like. Mere entry upon this portion of the property, at least during daylight hours when entry by such strangers would not be unexpected, did not therefore require a warrant. See Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (whether exterior of home constitutes "curtilage" for Fourth Amendment protection depends upon factors that determine if reasonable expectation of privacy exists). See also, Davis v. United States, 327 F.2d 301 (9th Cir.1964) (absent express orders against possible trespass, no per se Fourth Amendment violation for officers to approach front door of house during daytime). C.f. Rogers v. Pendleton, 249 F.3d 279 (4th Cir.2001) (remaining in yard after speaking with homeowner violated Fourth Amendment).
[1] In this case, there was no "search" of the home since Miller voluntarily handed over the illegal drugs to the police officer when they asked whether she had any. Accordingly, the majority's comments about the retaining of her identification once inside the house are irrelevant.