979 So.2d 1039 (2008)
The STATE of Florida, Appellant,
v.
Eudenis TRIANA, Appellee.
No. 3D07-1388.
District Court of Appeal of Florida, Third District.
March 19, 2008.
*1040 Bill McCollum, Attorney General, and Magaly Rodriguez, Assistant Attorney General, for appellant.
Gonzalez & Alvarez and Silvia M. Gonzalez, for appellee.
*1041 Before CORTIAS and ROTHENBERG JJ., and SCHWARTZ, Senior Judge.
CORTIAS, J.
The State of Florida ("State") appeals an order granting a motion to suppress filed by the defendant, Eudenis Triana ("Triana"). The trial court found that Mr. Triana was illegally seized and, as such, a subsequent consent to search by Triana was involuntary, resulting in the suppression of certain evidence.
This case implicates two different and legally distinct exceptions to the Constitutional requirement that an arrest or search must be based on probable cause and executed pursuant to a warrant. See Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The first exception which applies is the consensual encounter of police with Mr. Triana and the second is the consent search given by Mr. Triana. Each is viewed under the "totality of the circumstances." See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
We first examine the facts surrounding the initial questioning of Mr. Triana. Detective Nicholas Delguitiz, who worked for thirteen years at the Miami-Dade narcotics bureau, had received information from a confidential source telling him of marijuana growing at Triana's residence. The detective further testified that, although the informant did not work for the Miami-Dade police department, he personally knew the identity of the informant, and had worked with him in the past. Furthermore, the detective stated that he had previously received information from this informant and that the information had proven to be reliable.
Detective Delguitiz and three officers arrived at the outside gate of Mr. Triana's 1Ω to 2-acre residence at approximately 9 p.m. on July 26, 2006. The gate was closed and there was nobody outside the residence at that time. Another officer, Sergeant Albert Falcon, stated that Mr. Triana's residence was gated by either a hedge or a wooden fence that was six feet high. One of the officers momentarily blew the emergency horn on his police car, presumably to announce their presence at the residence. As a result, Triana's girlfriend exited the residence and met the officers at the locked gate. The officers advised her that they had received information that marijuana was being grown at this residence and requested consent to search. The girlfriend stated that she "lived there with her husband and she would ask his permission or talk with him about it." Moments later, Mr. Triana met the officers at the gate. Detective Delguitiz first ascertained whether or not Triana spoke English and learned he did not. Sergeant Falcon, who was fluent in Spanish, introduced himself to Mr. Triana, determined that Triana was the owner of the residence, and explained to him that the police had received a complaint that marijuana was being grown in the residence. Falcon asked for consent to search the residence and, in response, Triana agreed and opened the gate. During the suppression hearing, Falcon described the conversation with Triana as "casual." Prior to receiving consent and throughout the initial questioning, the officers were not on Triana's property. One of the detectives testified that they "would have just left" if the defendant had refused to consent.
We next detail the facts concerning the consent search inside the residence. Accompanied by Triana, three officers walked inside the house. Falcon testified that, as they walked through the main area of the house, he observed there was another *1042 building in the back of the property and asked Triana for consent to search the back building. Triana stated "what is back there is mine." Only a few minutes elapsed between the time the officers entered Triana's home and the time they observed the building in the back. Falcon then took out a written consent to search form, which was in Spanish, and read it to Triana. Mr. Triana signed the written consent form and took the officers to the building in the back of the property. Falcon stated that the building was divided in two parts, the front was a room with a kitchenette and the back was a hydroponics lab for growing marijuana. Police seized 103 pounds of marijuana at Triana's residence.
With respect to the initial meeting with Mr. Triana, the trial court held that the officers "effectively seized Mr. Triana" and that, at the time of encounter, the detectives did not have reasonable suspicion that Mr. Triana had committed a crime. Based on this holding, the trial court went on to find that "Triana's consent to search given after this illegal detention was involuntary."
We employ a mixed standard of review in considering the trial court's ruling on Mr. Triana's motion to suppress. The trial court's determination of historical facts enjoys a presumption of correctness and is subject to reversal only if not supported by competent, substantial evidence in the record. However, the trial court's determinations on mixed questions of law and fact and its legal conclusions are subject to de novo review. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor v. State, 803 So.2d 598, 608 (Fla.2001); E.B. v. State, 866 So.2d 200, 202 (Fla. 2d DCA 2004).
The Florida Supreme Court has explained that there are essentially three levels of encounters an individual can have with the police:
The first level is considered a consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. ß 901.151 Fla. Stat. (1991). In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.
. . . [T]he third level of police-citizen encounters involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); ß 901.15 Fla. Stat. (1991).
Popple v. State, 626 So.2d 185, 186 (Fla. 1993) (citation omitted).
On appeal, the State contends that the initial meeting between the officers and Mr. Triana was a consensual encounter and not an investigatory stop or an arrest. Because Mr. Triana had a reasonable expectation of privacy in his home, the question is whether he voluntarily opened the *1043 door or, alternatively, whether there were coercive circumstances that turned an ordinary consensual encounter into one requiring objective suspicion. See United States v. Cormier, 220 F.3d 1103 (9th Cir. 2000).
As a preliminary matter, we note that no level of suspicion was required before the officers arrived at the gate of Mr. Triana's residence and questioned him, or anyone else who happened to meet them at the gate. This is commonly referred to as a "knock and talk," which has been recognized as a legitimate investigative procedure so long as the encounter does not evolve into a constructive entry. United States v. Grayer, 232 Fed.Appx. 446 (6th Cir.2007); United States v. Thomas, 430 F.3d 274, 277 (6th Cir.2005) ("Consensual encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home."); People v. Rivera, 41 Cal.4th 304, 308, 59 Cal.Rptr.3d 473, 159 P.3d 60 (Cal. 2007) ("Even if acting on an anonymous, uncorroborated tip, police may knock on the door of a residence, speak with the occupant, and request permission to enter and search."); see Murphy v. State, 898 So.2d 1031 (Fla. 5th DCA 2005). As such, a knock on the door and subsequent discussion is a purely consensual encounter, which officers may initiate without any objective level of suspicion. Thomas, 430 F.3d at 277; see Bennett v. City of Eastpointe, 410 F.3d 810, 821 (6th Cir.2005) ("A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment.").
The fact that a consensual encounter takes place at the entrance of an individual's home does not call into question or in any way lessen the propriety of a consensual encounter. See United States v. Chambers, 395 F.3d 563, 568 n. 2 (6th Cir.2005); Cormier, 220 F.3d at 1109 (holding that "no suspicion needed to be shown in order to justify the `knock and talk'"). In this case, although not dispositive, the location of the interview is a factor that supports a conclusion that the defendant was not in custody. Here, it is undisputed that the officers remained outside of Triana's property during their initial questioning. Moreover, an interview with a suspect in his own home is not ordinarily regarded as a custodial interrogation. See Duddles v. State, 845 So.2d 939 (Fla. 5th DCA 2003). Judge Padovano has correctly observed that a suspect who is questioned in his own home is not likely to have a sense that he is being detained, as might be the case if the suspect had been stopped on a highway or taken to an interrogation room at the police station. Evans v. State, 911 So.2d 796 (Fla. 1st DCA 2005). Similarly, in Taylor v. State, 855 So.2d 1 (Fla.2003), the Supreme Court of Florida was confronted with a consensual encounter at an individual's home and found that under the "totality of the circumstances . . . a reasonable person in Taylor's position would have felt free to leave or terminate the encounter." Id. at 15.
Triana, as well as the trial court, relied on Miller v. State, 865 So.2d 584 (Fla. 5th DCA 2004), for the proposition that Mr. Triana's meeting with police constituted a seizure. However, we find Miller to be entirely distinguishable. For example, in Miller, the Fifth District found the "most significant factor" to be the words and actions of the officers in dissuading the defendant from leaving the residence by stating that there was a "need" that defendant remain there and retaining defendant's identification throughout the questioning. Id. at 588; see also Kutzorik v. State, 891 So.2d 645 (Fla. 2d DCA 2005) (involving repeated requests for consent to search small mobile home while the resident *1044 was in an emotional state). These circumstances are entirely absent in Triana's case.
Nevertheless, a consensual encounter at the doorstep may evolve into a "constructive entry" when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home. Thomas, 430 F.3d at 277. Constructive entry has been found when a suspect emerged from a house "in response to coercive police conduct." United States v. Morgan, 743 F.2d 1158, 1166 (6th Cir.1984). Coercive police conduct occurs where there is "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." United States v. Saari, 272 F.3d 804, 809 (6th Cir.2001).
The presence of police officers alone, absent any indication of coercive words or acts, misrepresentation, deception, or trickery is insufficient to raise an inference of submission to police authority. State v. Swank, 399 So.2d 510, 512 (Fla. 4th DCA 1981) (citing United States v. Griffin, 530 F.2d 739 (7th Cir.1976); United States v. Marshall, 452 F.Supp. 1282 (S.D.Fla.1978), rev'd on other grounds, 609 F.2d 152 (5th Cir.1980)). The difference between a consensual encounter and a "constructive entry" frequently depends on the show of force exhibited by the police. Thomas, 430 F.3d at 277. As such, drawn weapons, coercive actions and demands, or raised voices by the police have been found to result in non-consensual encounters. Saari, 272 F.3d at 808 (involving four officers who "positioned themselves in front of the only exit from [d]efendant's apartment with their guns drawn . . . knocked forcefully on the door and announced that they were the police"); Sharrar v. Felsing, 128 F.3d 810, 819 (3d Cir.1997) (involving a SWAT team who surrounded the house, pointed machine guns at the windows, and ordered the occupants out), abrogated on other grounds, Curley v. Klem, 499 F.3d 199 (3d Cir.2007); United States v. Maez, 872 F.2d 1444, 1449-50 (10th Cir.1989) (involving FBI agents and a SWAT team that surrounded a trailer with guns pointed at the home and addressed the occupants over loudspeakers); United States v. Edmondson, 791 F.2d 1512, 1514 (11th Cir.1986) (involving officers who surrounded the front of the defendant's apartment, with weapons drawn, and yelled, "FBI. Open the door"); United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir.1985) (involving police who had completely surrounded a trailer with their weapons drawn and ordered the occupant through a bullhorn to leave the trailer); Morgan, 743 F.2d at 1161 (involving ten officers who surrounded the house, blocked the suspect's car, "flooded the house with spotlights and summoned Morgan from his mother's home with the blaring call of a bullhorn").
The fact that four officers were present during the encounter with Mr. Triana does not necessarily indicate coercion, especially where, as here, we are dealing with a narcotics investigation pertaining to a 1Ω to 2-acre residence. See Thomas, 430 F.3d at 276 (presence of four officers, without more, did not show police entered the home or defendant exited the house as a result of physical force or any other conspicuous show of authority by the police); U.S. v. Pena, 143 F.3d 1363 (10th Cir.1998) (presence of four officers, including three that were armed, who came to defendant's motel room found not to be coercive where none of the officers unholstered a firearm and remained outside the motel room until Pena gave them permission to enter); United States v. Durades, 929 F.2d 1160, 1166-67 (7th Cir.1991) (presence of three officers, who acted professionally at all times, in one apartment with three occupants *1045 was not coercive); Swank, 399 So.2d at 512 (presence of two officers at defendants' hotel room alone, absent evidence of coercive words or acts, misrepresentation, deception, or trickery is insufficient to raise an inference of submission to police authority); People v. Gillam, 479 Mich. 253, 734 N.W.2d 585 (2007) (presence of three police officers conducting a narcotics investigation did not constitute coercion). Triana does not assert, and the record does not support a conclusion, that the police officers conducted themselves in an unprofessional manner. Accordingly, the presence of four officers outside the gate of a two-acre property, none of whom drew any weapons or made coercive demands of Mr. Triana, does not render the encounter non-consensual.
Nor does the fact that the officers' meeting with Mr. Triana occurred at 9 p.m. transform an otherwise consensual encounter into a seizure. See Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."); People v. Tweedy, 126 P.3d 303 (Colo.Ct.App.2005) (presence of three police officers at 5:10 a.m. outside defendant's hotel room was not coercive where police sought permission to enter and search room in a conversational voice).
A review of the "totality of the circumstances" reveals that the officers' conduct did not rise to the level of a constructive entry. In doing this, we do not invade the fact-finding province of the trial court by resolving conflicts in testimony. In fact, there was no conflicting testimony by Mr. Triana or anyone else, and the trial court did not disbelieve any of the officers. The circumstances of this case show that Triana's girlfriend declined the officers' request for consent by stating "she would ask his [Triana's] permission or talk with him about it." Triana's encounter with the officers took place at the gate of his residence, outside of the property, where Mr. Triana responded to a simple request by the officers for consent to search his home. The police officers never displayed any weapons during the entire encounter, further illustrating that they did not employ physical force or official authority to gain entry into the residence. They never spoke to Triana in an authoritative tone or in any way lead him to believe that he had no choice but to comply with their request for consent to search. Furthermore, Triana did not present any evidence that he ever attempted to terminate the encounter with the officers or that he was not entitled to do so. Under these facts, there is no basis for concluding that a reasonable person in Mr. Triana's situation would believe that he was either under arrest or otherwise compelled to leave the house. As such, no "constructive entry" occurred. See Cormier, 220 F.3d 1103.
Because we find that the initial entry into Mr. Triana's residence occurred through a consensual encounter with police followed by consent to enter the residence, we conclude that Triana was not illegally detained when he gave consent to search his residence and the outside building. Accordingly, we reverse the suppression order and remand for proceedings consistent with this opinion.
Reversed and remanded.