EMAS, J.
Appellant, State of Florida, appeals from an order granting Jarvis Williams’ motion to suppress evidence upon a finding that there were no exigent circumstances to support a constructive entry of his home without a warrant. For the reasons that follow, we reverse.
Jarvis Williams was charged by information with carrying a concealed firearm and possession of a firearm by a convicted felon. Williams filed a motion to suppress all evidence seized following his arrest, contending that police officers constructively entered Williams’ home by ordering him out of the house so they could effectuate an arrest. This warrantless “entry” into the home, Williams argued, violated the Fourth Amendment.
At the hearing on the motion to suppress, two witnesses testified — Officer Diaz and Sergeant Rodriguez. Officer Diaz testified as follows: He is an officer with the Miami-Dade Police Department and a member of the Strategic Police Operations Response Team (SPORT). Around 1:00 a.m. on the night in question, Officer Diaz and several other SPORT units were patrolling a four-square block area, in marked police vehicles. The police had received several threats within that week that police officers were going to be shot and killed. During the patrol, a radio dispatch indicated that shots were being fired near the patrol location. Officer Diaz got out of his vehicle and heard several shots that sounded close to him; however, Diaz did not actually see anyone shooting, nor could he tell exactly where the shots were coming from. Backup officers arrived in the area, and Officer Diaz began walking on foot to investigate. He did not have a description of the shooters, nor did he know how many people were firing guns.
As he was patrolling on foot, Officer Diaz saw three black males in the backyard of a home. One of the individuals placed something behind a doghouse located in the backyard. Though Officer Diaz was not certain, he believed the object was a firearm, based on the way the individual held the object and removed it from his waistband. Officer Diaz did not have binoculars but testified there were streetlights that provided ambient lighting. He continued to observe the three individuals in the yard, and they appeared to be trying to hide; soon after, the three individuals crossed the street and walked into *32 another yard. Officer Diaz could not determine which of the three males put the object behind the doghouse, nor did he ever investigate what was placed behind the doghouse.
Officer Diaz issued a BOLO (be on the lookout) with a description of these individuals. Once the three men walked into the second yard, Officer Diaz got back into his vehicle. He was not present when Williams was later taken into custody.
Sergeant Rodriguez testified as follows: He was also patrolling with the SPORT team on the night in question. Like Officer Diaz, Sgt. Rodriguez heard shots fired but was unable to see who fired the shots. Accordingly, he could not identify the race, gender or number of shooters. Some time after hearing the shots, and having heard Officer Diaz’s BOLO, Sgt. Rodriguez saw appellee, Jarvis Williams, walking across the street holding onto his waistband, but he did not see a bulge in the waistband. Williams saw Sgt. Rodriguez approach and began walking faster. As Williams neared the yard of another home, Sgt. Rodriguez approached in his vehicle, identified himself as a police officer, and ordered Williams to stop based on the following: he had heard gunshots in the area, Williams was near the yard where Officer Diaz had seen a person place a suspected firearm behind the doghouse, and the BOLO described the individuals seen near the doghouse as “black males,” including a general description of clothing and hair. By the time Sgt. Rodriguez exited his car with his weapon drawn, Williams had entered the yard. Williams headed for the front porch of the house, jumped over a set of bushes, tossed a firearm into one of the bushes, and continued into the home. Sgt. Rodriguez then walked up to the door of the house and ordered Williams out of the house so he could make an arrest. Sergeant Rodriguez said he ordered Williams out of the house “because he had a firearm concealed away from my vision, and I saw him toss it. And if it’s a legal gun, why did he toss it?” Williams came out of the house and was taken into custody. Sergeant Rodriguez then ran Williams’ name and learned he was a convicted felon.
The trial court granted Williams’ motion to suppress. The court found that Williams’ submission to Rodriguez’s order to come out of the house was a constructive entry of the home. The court further found that, although the officers’ “conduct [was] forthright and their testimony credible”, their testimony did not establish a predicate sufficient to justify the warrant-less entry into the home to arrest Williams. This appeal followed.
In essence, the trial court held that even if the officer had probable cause to arrest Williams for carrying a concealed firearm (the firearm Williams tossed into the bushes immediately before entering the home), once Williams entered the home the officer needed an arrest warrant or some exception that would permit a war-rantless entry into the home to effectuate the arrest. The trial court determined that the officer’s command that Williams exit the house was a “constructive entry” into the home. The court concluded that this warrantless “entry” did not fall under any exception to the warrant requirement and was therefore impermissible under the Fourth Amendment. We disagree.
Although the trial court “assumed” for purposes of its ruling that Sgt. Rodriguez had probable cause to arrest Williams for carrying a concealed firearm, the trial court did not expressly find this to be the case.[1] However, it is clear that Sgt. Rod *33 riguez had probable cause to arrest Williams. The unrebutted testimony established that, after being ordered to stop, Williams took a gun which was previously concealed from Sgt. Rodriguez’s view and threw it into the bushes before entering the residence.[2] These observations of Williams’ actions provided probable cause to arrest Williams for carrying a concealed firearm.[3]
Thus, the only remaining question is whether the officer could make a war-rantless arrest in the home where:
1. The officer has probable cause to arrest the defendant, after observing the defendant in possession of a concealed firearm; and
2. The officer lawfully orders the defendant to stop, but the defendant, in defiance of that order, continues walking and immediately thereafter enters into his residence.[4]
Williams argues that, absent a warrant or an exception to the warrant requirement, the constructive entry into the home (by ordering Williams to exit the house) constituted an impermissible warrantless arrest effectuated in Williams’ home.
When reviewing rulings on motions to suppress, a presumption of correctness attaches to the lower court’s determination of facts, but questions of law are reviewed de novo. Riggs v. State, 918 So.2d 274 (Fla.2005).
We need not reach the issue of whether the trial court was correct in its determination that the actions of the police constituted a constructive entry into the home.[5] *34 Even if such actions amounted to a constructive entry, it was reasonable under the Fourth Amendment.
We begin by acknowledging that a warrantless entry of the home is considered one of the primary evils which the Fourth Amendment was designed to protect. Riggs, 918 So.2d at 278 (citing Pay-ton v. New York, 445 U.S. 573, 100 S.Ct. 1871, 68 L.Ed.2d 639 (1980)). The home generally may not be entered without a warrant. Id. Thus, this Court has recognized the general rule that “[warrantless searches or arrests in constitutionally protected areas, particularly one’s home, are per se unreasonable unless they fall within one of the established exceptions to the warrant requirement.” State v. Brown, 36 So.3d 770, 771 (Fla. 3d DCA 2010), disapproved of on other grounds, State v. Cable, 51 So.3d 434 (Fla.2010). One such exception is “hot pursuit.” Brown, 36 So.3d at 771-72; Gasset v. State, 490 So.2d 97 (Fla. 3d DCA 1986). See also Georgia v. Randolph, 547 U.S. 103, 117, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).
In Gasset, police officers observed the defendant driving erratically. The officers began following him and a high-speed chase ensued, ending when Gasset drove onto his residential property and into his garage, which was attached to the house. The officers arrived immediately behind Gasset and, as Gasset exited his vehicle, the officers entered the garage and arrested him. Gasset was ultimately charged with driving under the influence. The trial court granted Gasset’s motion to suppress and this Court reversed, finding the officer’s warrantless entry into defendant’s home to make the arrest was justified under the hot pursuit exception:
Gasset waived any expectation of privacy he may have had in his garage by engaging in the high-speed chase ... and leading the officers directly to the place of his arrest. The enforcement of our criminal laws, including serious traffic violations, is not a game where law enforcement officers are “it” and one is “safe” if one reaches “home” before being tagged.
Gasset, 490 So.2d at 98-99 (internal citations omitted).
In Gasset, we relied on the United States Supreme Court’s decision in United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In Santana, police officers went to the home of a known drug house to arrest a woman who had sold drugs to an undercover officer. The police saw the woman (Santana) standing in the doorway of the house and pulled up to within fifteen feet of her, displayed then' identification and shouted “police.” Santana retreated into the vestibule of her home, and the officers followed her through the open door where she was arrested. The Court held that Santana was in a “public” place while standing in the open doorway, and that “a suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place.” Santana, 427 U.S. at 42-43, 96 S.Ct. 2406.
In the case at bar, Williams committed a crime (carrying a concealed firearm) in a public place.[6] The officer, acting *35 in hot pursuit, attempted to make a war-rantless arrest upon probable cause before Williams entered the house. Williams could not thwart this effort, or convert a proper warrantless arrest into one requiring a warrant, simply by reaching his house before the officer reached him.
Finally, the fact that the “hot pursuit” was brief is of no moment. As the United States Supreme Court observed in Santana:
The District Court was correct in concluding that “hot pursuit” means some sort of a chase, but it need not be an extended hue and cry “in and about (the) public streets.” The fact that the pursuit here ended almost as soon as it began did not render it any the less a “hot pursuit” sufficient to justify the warrantless entry into Santana’s house.
Santana, 427 U.S. at 42-43, 96 S.Ct. 2406.
The trial court erred in granting the motion to suppress. We therefore reverse and remand with directions to vacate the order granting the motion to suppress and to enter an order denying same.

. At the conclusion of the evidentiary hearing, the court heard legal argument from the state *33 and defense. The court took the matter under advisement and, the following day, announced its decision orally. The transcript of that oral announcement reflects no determination on the issue of probable cause.

. Because the firearm was abandoned voluntarily by Williams, its seizure was lawful and Williams does not contend (nor did the trial court find) that his action in removing the gun from his waistband and tossing it into the bushes was the result of any unlawful conduct by the police. The evidence sought to be suppressed was, in essence, the defendant himself and his identification, fingerprints, photographs, all of which were seized or obtained after he was ordered to come out of the house.

. See § 790.001(2), Fla. Stat. (2010) (providing a "concealed firearm” is defined as “any firearm... which is carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person.”); Ensor v. State, 403 So.2d 349, 354 (Fla. 1981) (holding "absolute invisibility is not a necessary element to a finding of concealment under section 790.001”). See also Mackey v. State, 83 So.3d 942, 946 (Fla. 3d DCA 2012) (holding the crime of carrying a concealed firearm is complete upon proof that the defendant knowingly carried a firearm that was concealed from the ordinary sight of another person).

. Although Sgt. Rodriguez ordered Williams to stop before Williams revealed the gun and threw it into the bushes, the testimony of Sgt. Rodriguez and Officer Diaz established that Sgt. Rodriguez already had reasonable suspicion to justify a temporary detention of Williams and the order to stop was therefore proper. See C.E.L. v. State, 24 So.3d 1181, 1186 (Fla.2009) (holding a "stop is justified when an officer observes facts giving rise to a reasonable and well-founded suspicion that criminal activity has occurred or is about to occur. In turn, whether an officer’s well-founded suspicion is reasonable is determined by the totality of the circumstances that existed at the time of the investigatory stop and is based solely on facts known to the officer before the stop.”)

. The evidence at the hearing established that when Sgt. Rodriguez ordered Williams out of the home, he did not come willingly. Rather, when the door opened following Sgt. Rodriguez's command, Williams was pushed out of the doorway by his grandmother. It is, at best, unclear whether Williams’ decision to exit the house was "in response to coercive *34 police conduct” in which "there is such a show of authority that the Defendant reasonably believed he had no choice but to comply!.]” see State v. Triana, 979 So.2d 1039, 1044 (Fla. 3d DCA 2008) (quoting United States v. Saari, 272 F.3d 804, 809 (6th Cir. 2001) or whether, as Sgt. Rodriguez testified, "[h]is grandmother kicked him out.” Given our holding, it is unnecessary to reach this issue.

. The fact that Williams was already in the yard of his house when he threw the gun into a bush does not compel a conclusion that the *35 conduct occurred in a "private place.” First, the criminal conduct at issue was the carrying of a concealed firearm, conduct which occurred, and was observed, on the public street prior to Williams’ entry into his yard. The officer's discovery that Williams had been committing a crime occurred when Williams revealed the concealed firearm while in his own yard. Second, even if the criminal conduct could be said to have occurred in Williams' yard, his argument still fails. The Santana Court considered and rejected this very proposition: While it may be true that under the common law of property the threshold of one’s dwelling is "private,” as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public” place. She was not in an area where she had any expectation of privacy.... She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.
Santana, 427 U.S. at 42, 96 S.Ct. 2406.