# Third District Court of Appeal

## State of Florida

Opinion filed July 23, 2014.
This opinion is not final until disposition of any further motion for rehearing and/or rehearing en banc. Any previously-filed motion for rehearing en banc is deemed moot.

_____

No. 3D08-1079
Consolidated: 3D08-1077
Lower Tribunal Nos. 05-37152; 07-10526A

_____

**The State of Florida,**
Appellant,

vs.

**Manuel Ojeda,**
Appellee.


Appeals from the Circuit Court for Miami-Dade County, Rosa I. Rodriguez, Judge.

Pamela Jo Bondi, Attorney General, and Lane Hodes and Nikole Hiciano, Assistant Attorneys General, for appellant.

Jay Levine, for appellee.

Before SHEPHERD C.J., and SUAREZ and ROTHENBERG, JJ.[*]

_____

[*] Judge Rothenberg did not participate in oral argument.

SHEPHERD, C.J.

These consolidated cases are back before the Court on the State's motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A). By opinion filed May 1, 2013, we granted the State of Florida's motion for rehearing in Case No. 3D08-1077 (lower tribunal number 05-37152) and denied the State's motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A). We now grant the State of Florida's motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A) and reverse the trial court order granting the motion to suppress in that case as well. We substitute the following opinion for that issued on May 1, 2013.[1]

This is the State's consolidated appeal of adverse rulings in two suppression hearings involving the same defendant, Manuel Ojeda. Ojeda's business is hydroponic marijuana farming. He had an extensive criminal history, including at least six felony and misdemeanor convictions, before his arrest in Case No. 05-37152. He is well known to the local authorities, down to the type of vehicle he drives. Miami-Dade County Police Department Detective Edward Orenstein was

---

[1] The defendant did not file a motion for rehearing in Case No. 3D08-1077. Thus, the decision and opinion of the Court in that case are final in this court. We restate the opinion in that case here for convenience of the reader.

2

the sole State witness at each suppression hearing. We treat the State's appeal from each order in turn.

## Case No. 05-37152

On November 30, 2005, Detective Orenstein received an anonymous tip that marijuana was being grown at a private residence located at 7621 S.W. 136th Avenue, Miami-Dade County, Florida. A background check on Ojeda—who Orenstein had been investigating as a suspect in the grow house business and who Orenstein apparently knew or learned either owned, resided at, or otherwise was associated with the residence—revealed Ojeda's prior felony and misdemeanor offenses. Armed with this information, Orenstein, along with three other detectives, one sergeant, and two uniformed officers, went to Ojeda's residence at 7:45 a.m. that morning.

Orenstein and one other detective went to the front door. Two uniformed officers were standing on the sidewalk at the front of the residence, about twenty to thirty feet from the front door, their marked police cars parked behind them at the side of the road. The officers and their vehicles were visible to anyone who chose to look out of the residence. The other three detectives were deployed around the sides of the house, prepared to stop any fleeing suspects.

Ojeda, who had just gotten out of bed, responded to Detective Orenstein's knock on the front door. According to Orenstein, when Ojeda opened the door,

3

Orenstein explained the purpose of his visit, in response to which Ojeda replied, "Come on inside." As Detective Orenstein and his colleague at the door entered the house, the three detectives emerged from the sides of the house and also entered. All five detectives were dressed in plain clothes, covered by a vest with the word "Police" across the front, and a badge and identification hanging around their necks. No guns were drawn, and no insistent statements or threats were uttered by any detective.

Once inside the house, Orenstein read Ojeda the warnings required by Miranda[2] to be given to a person in custody and asked Ojeda whether he understood them. Ojeda responded in the affirmative and, according to Orenstein, was "willing to cooperate with me with whatever I asked." Thereupon, Orenstein asked whether Ojeda would consent to a search. Ojeda agreed and signed a consent form to search the house, adding, "Come, I'm going to show you around the house." As the detectives were going through the house, Orenstein additionally asked for consent to search the vehicles in the driveway. According to Orenstein, Ojeda responded, "Yes, sure," which response was confirmed by the execution of yet another consent form.[3] Ojeda ultimately led the detectives into the garage, where they encountered a marijuana hydroponics grow operation. Ojeda claimed he recently had moved back into the house, after having leased it to someone, and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).
[3] The search of the vehicles was non-productive.

4

found the garage in this condition. He could neither produce the name of the lessee or a lease, nor had he called the police regarding his find. Ojeda did not appear scared, under the influence of any narcotics, to have any mental issues, or to have issues of understanding during the encounter. Orenstein described Ojeda's demeanor as "confident that whatever he was going to tell me about a tenant being in the house," would be credible. There was no evidence of odor detection before the door to the garage was opened.

The trial court granted the motion to suppress on the ground consent to search the premises was unlawfully procured through an overwhelming show of police authority, exacerbated by an unnecessary administration of Miranda on the defendant. The trial court also held Orenstein's testimony was not credible. On de novo review, according a presumption of correctness to the trial court's finding of historical facts, as we are required to do, we conclude the defendant's consents to search were objectively voluntary. We also conclude the trial court erred in finding Detective Orenstein's testimony not credible.

Whether consent is freely and voluntarily given is determined by the totality of the circumstances. Taylor v. State, 355 So. 2d 180, 183 (Fla. 3d DCA 1978) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227-29 (1973)); see also State v. Othen, 300 So. 2d 732, 733 (Fla. 2d DCA 1974). The factors to be considered include the age and maturity of the accused; whether he had a prior criminal

5

history; the time and place of the encounter; the number of officers; whether the defendant executed a written consent form; the length of time police interrogated him before he consented; whether he was in custody; and the words and actions of the officers. Miller v. State, 865 So. 2d 584, 587 (Fla. 5th DCA 2004) (citing United States v. Broomfield, 201 F.3d 1270, 1274 (10th Cir. 2000); United States v. Glass, 128 F.3d 1398, 1406 (10th Cir. 1997)). In conducting our review, we accord a presumption of correctness to the trial court's findings of historical facts where there is substantial competent evidence to support them. State v. Glatzmayer, 789 So. 2d 297, 301 (Fla. 2001). However, our application of the law to the facts, including our determination of whether the defendant's consent was objectively voluntary, is de novo. Id. Finally, because a home is an area in which a person enjoys the highest reasonable expectation of privacy, we scrutinize the factors with special care. Payton v. New York, 445 U.S. 573, 585 (1980); Gonzalez v. State, 578 So. 2d 729, 732 (Fla. 3d DCA 1991).

In this case, the trial court relied on only three factors to conclude the consent to search was involuntary: (1) the time and place of the encounter; (2) the number of officers; and (3) the words and actions of those officers. A full analysis of all the factors, as required by law, mandates a reversal of the order entered by the trial court in this case.

6

First, Ojeda's age, thirty-four at the time of the search, suggests he was of sufficient maturity and experience to make an intelligent decision. Second, there is no evidence he was intoxicated or otherwise impaired. Third, Ojeda executed a written consent form that was in English, after being asked whether he wanted it in English or Spanish. See Luna-Martinez v. State, 984 So. 2d 592, 600 (Fla. 2d DCA 2008) ("[T]he presence of a written consent tends to support the conclusion that the consent was given voluntarily."). Fourth, Ojeda had a prior criminal history, creating a presumption he knew his rights. See Wilson v. State, 952 So. 2d 564, 570 (Fla. 5th DCA 2007) ("[W]hether he had a prior criminal history—the presumption being that one who has prior criminal arrests knows his legal rights . . . ."). Fifth, Ojeda was read the warnings required by Miranda prior to executing the written consent. Although the warnings were unnecessary, see Davis v. State, 698 So. 2d 1182, 1189 (Fla. 1997) ("Miranda warnings are required whenever the State seeks to introduce against a defendant statements made by the defendant while in custody **and** under interrogation. Absent one or the other, Miranda warnings are not required."), recent authority from our supreme court has recognized that, depending on the circumstance, an unneeded administration of Miranda warnings can be more protective of an individual's rights than intimidating in nature. See Caldwell v. State, 41 So. 3d 188, 201 (Fla. 2010); see also Ladson v. State, 63 So. 3d 807, 809 (Fla. 3d DCA 2011) ("[T]he

7

administration of <u>Miranda</u> warnings, as a matter of law, does not transform a consensual encounter into a seizure."); <u>accord</u> <u>Ruiz v. State</u>, 50 So. 3d 1229, 1232 (Fla. 4th DCA 2011). Upon consideration of the totality of the circumstances of this case, we conclude the administration of <u>Miranda</u> warnings to Ojeda did not compromise his decision-making faculties. Although the warnings given him were not tailored to a consent to search, he was advised he had the right to counsel and the right to terminate the encounter at any time. He never elected to terminate the encounter. Rather, he communicated with the authorities in a cooperative spirit from the moment he opened the front door.

Sixth, Ojeda was not deprived of any convenience or sequestered for an undue length of time prior to signing the consent. The <u>Miranda</u> administration took just a few minutes. Ojeda then volunteered to "cooperate with whatever [he was] asked." Detective Orenstein then asked him to sign the consent form. Ojeda did so upon the first request. He read the form himself before signing. The search of the house began immediately thereafter. There is no evidence Ojeda was under undue stress.[4] In fact, the evidence in this case reveals Ojeda signed an additional

_____

[4] To some extent, any encounter with an officer of the law may lead to some apprehension. <u>See</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is a part of a law enforcement system which ultimately may cause the suspect to be charged with a crime."). However, this fact alone cannot support a seizure under the Fourth Amendment. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968).

8

consent form to expand the scope of the search while it was ongoing. This provides at least some further support for the inference that the consent was voluntary.

Seventh, that the encounter between the police and Ojeda took place on Wednesday, November 30, 2005, at 7:45 a.m., is a factor in favor of the State's position. The officers did not arrive in the middle of the night. Seven forty-five on a Wednesday morning is the usual time ordinary business or working people are getting ready for work or eating breakfast. It might be that Ojeda's business is more nocturnal in nature than others. However, he has no greater constitutional right to sleep in than anyone else.

Lastly, there was no overwhelming display of force in this case. Detective Orenstein testified he and just one other detective were at the door, and that the other three detectives emerged and entered the house after Orenstein and his companion were invited to enter. Ojeda was read his <u>Miranda</u> rights and the consent to search requested. Ojeda's counsel argues the presence of five officers in the house at the time the consent to search was requested, together with the presence of two uniformed officers on the sidewalk, overpowered Ojeda's decision-making faculties. We disagree on the facts in this case.

The inherent danger involved in a narcotics investigation compels the use of caution. It seems entirely reasonable to order a complement of seven law

9

enforcement officers to investigate a tip of this nature. In fact, it would seem irresponsible not to send at least two persons to the front door. Only in retrospect do we know what awaited Orenstein and the other detective who accompanied him to the door. Case law is replete with examples of circumstances where no show of force has been found to exist under similar facts. See, e.g., United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008) (finding the presence of three officers did not, by itself, render consent involuntary); United States v. Thomas, 430 F.3d 274, 276 (10th Cir. 2005) (concluding presence of four officers, without more, did not render consent involuntary); United States v. Ramirez-Chilel, 289 F.3d 744, 751 (11th Cir. 2002) (stating the presence of five officers did not render consent involuntary); United States v. Pena, 143 F.3d 1363, 1367 (10th Cir. 1998) (stating presence of four officers, including three that were armed, who came to defendant's motel room, found not to render consent involuntary); United States v. Padilla-Pena, 129 F.3d 457, 467 (8th Cir. 1997) (concluding presence of three officers did not render consent involuntary); United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (finding the presence of three officers did not render consent involuntary); United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993) (finding that presence of five officers did not render consent per se involuntary); United States v. Durades, 929 F.2d 1160, 1166-67 (7th Cir. 1991) (stating presence of three officers, who acted professionally at all times, in one apartment with three

10

occupants, was not coercive); <u>Luna-Martinez</u>, 984 So. 2d at 600 (stating presence of three to four officers outside defendant's apartment did not render consent per se involuntary); <u>State v. Triana</u>, 979 So. 2d 1039, 1044-45 (Fla. 3d DCA 2008) (finding presence of four officers did not render consent involuntary); <u>Wilson v. State</u>, 952 So. 2d 564, 570 (Fla. 5th DCA 2007) (finding presence of three officers who had trespassed onto property and initially accosted defendant at gunpoint did not vitiate consent to search given after time passed); <u>Putnel v. State</u>, 746 So. 2d 521, 523 (Fla. 2d DCA 1999) (finding presence of two officers did not render consent involuntary). In fact, most authorities opine it is not so much the police presence that upends an otherwise lawful police action, such as the one reviewed here, but rather the verbal acts of those officers. <u>See, e.g.</u>, <u>Luna-Martinez</u>, 984 So. 2d at 600 ("A suspect is more likely to be overawed by one officer speaking in an insistent, demanding tone than is a suspect who is addressed in a low-key manner in an encounter with several officers."). There is no evidence in this case that any of the law enforcement personnel on the premises did or said anything a reasonable person would understand as an assertion of authority to search.

We also conclude the trial court erred by finding Detective Orenstein's testimony was not credible. Although the evidentiary hearing in this case was one of three such hearings directly or indirectly involving Detective Orenstein, held in tandem by the trial judge on the same day, and while taken together the trial judge

11

appropriately had some cause for concern about Detective Orenstein's credibility, counsel agreed at the beginning of the hearings that each matter would proceed and be argued "case by case." Although defense counsel argued Detective Orenstein was not a credible witness, he introduced no evidence impeaching or contradicting Orenstein's testimony in this case. The long-settled law of this District is that in a suppression hearing context, the trial judge must accept any evidence by a police officer "which is neither impeached, discredited, controverted, contradictory within itself, or physically impossible." See State v. Fernandez, 526 So. 2d 192, 193 (Fla. 3d DCA 1988) ("Although the trial judge purported to find the testimony of the officers at the motion to suppress 'not credible,' he was not free to do so.") (citing Flowers v. State, 143 So. 612 (1932); Brannen v. State, 114 So. 429 (1927); Harris v. State, 104 So. 2d 739 (Fla. 2d DCA 1958)). The record in this case does not reveal any evidence that the testimony of Orenstein met any of the criteria by which it could have been discounted by the trial judge, and the trial judge cites no such evidence. For all of these reasons, we reverse the order granting the motion to suppress in Case No. 05-37152.

## Case No. 07-10526A

Case No. 07-10526A can be treated with greater dispatch. The record in this case reveals that on March 23, 2007, eighteen months after Detective Orenstein and his squad conducted their warrantless search of Ojeda's residence, located at

7621 S.W. 136th Avenue, they travelled to a nearby residence where Orenstein believed Ojeda might be found, for the purpose of arresting him on ten-day-old charges on another grow house case, Case No. 07-10525, if Ojeda answered the door.[5] Detective Willie Knapp, the lead investigator on that case, was in the process of obtaining a warrant for Ojeda's arrest, but it had not yet been secured at the time of Detective Orenstein's arrival at the house.

Nevertheless, accompanied by Officer Benjamin, Detective Orenstein knocked on the front door of the house. Ojeda answered. An unmistakable odor of marijuana wafted across the threshold. Without asking permission, Orenstein and Benjamin entered the house and handcuffed Ojeda. Confronted by conflicting statements by Ojeda and suspicious sounds, Detective Orenstein next performed a protective sweep of the house for officer safety, producing an additional arrest. The grow house, which resulted in the charges that spawned the subject of the motion to suppress, was discovered in a second sweep of the house, conducted five or ten minutes later, once additional backup officers arrived. After a few hours, Detective Orenstein obtained a warrant and seized the contraband. The trial court granted Ojeda's motion to suppress the physical evidence seized from the house.

As in Case No. 05-37152, the trial court had serious doubts about the credibility of Detective Orenstein in many respects, including whether he spoke to

---

[5] At the time, Ojeda was on probation in Case No. 05-37152 pursuant to a plea. The plea was subsequently vacated.

Detective Knapp before or after he arrested Ojeda, and whether Officer Orenstein's protective search of the house was truly based upon suspicious sounds emanating from another location in the house. However, Case No. 07-10526A is a single witness case. Detective Orenstein's testimony that he smelled the odor of the marijuana at the threshold before he entered the house is neither contradicted nor impeached in the record. As in Case No. 05-37152 discussed above, the record does not reveal any evidence that Detective Orenstein's testimony that he smelled marijuana immediately upon Ojeda's opening of the front door met any of the criteria by which it could have been discounted by the trial judge, and the trial judge cites no such evidence. See State v. Fernandez, supra; see also State v. Dickson, 35 So. 3d 1027, 1027 (Fla. 3d DCA 2010); State v. Wong, 990 So. 2d 1154, 1156 (Fla. 3d DCA 2008); State v. Casey, 821 So. 2d 1187, 1188 (Fla. 3d DCA 2002); Cordero v. State, 526 So. 2d 1075, 1076 (Fla. 3d DCA 1988); State v. G.H., 549 So. 2d 1148, 1149 (Fla. 3d DCA 1989).

Moreover, Detective Orenstein and Officer Benjamin had every right to proceed to the front door of the house where Detective Orenstein thought Ojeda might be found. It was Detective Orenstein's intent as he approached the house to arrest Ojeda on the charges in the Knapp case if Ojeda was there. The record is devoid of any evidence that Detective Orenstein or Officer Benjamin approached the house with the intent of committing an unlawful act. "Under Florida law, one

14

does not harbor an expectation of privacy where salesmen or visitors may appear." See State v. Morsman, 394 So. 2d 408, 409 (Fla. 1981). In addition, as we recently stated, "The fact that a consensual encounter occurs at the entrance of an individual's home does not call into question or in any way lessen the propriety of a consensual encounter." State v. Triana, 979 So. 2d 1039, 1043 (Fla. 3d DCA 2008). Thus, in such a circumstance, a police officer not armed with a warrant may approach a home and knock, precisely because, as the United States Supreme Court pronounced in Florida v. Jardines, 133 S.Ct. 1409, 1416 (2013) (quoting Kentucky v. King, 131 S. Ct. 1849, 1862 (2011)), "that is 'no more than a private citizen might do.'" Detective Orenstein's excursion to the front door of Ojeda's house in the company of Officer Benjamin was a lawful consensual encounter.

Finally, the defense argues that the physical evidence discovered in the second sweep of the house was illegally retrieved because it occurred after an illegal entry into the home by Detective Orenstein upon the opening by Ojeda of his front door. The State concedes that Detective Orenstein's entry into Ojeda's home was illegal. However, that is not the end of the inquiry.

The United States Supreme Court consistently has held that the "exclusionary rule" has no application where the government can show it has learned of the challenged evidence from an "independent source." The rule applies where the illegal search or seizure was not an **actual cause** of the discovery of the

15

subject evidence. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920). The Court stated:

> The essence of [the Fourth Amendment] provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. **If knowledge of them is gained from an independent source they may be proved like any others . . .**

Id. (emphasis added); see also Murray v. United States, 487 U.S. 533 (1988); Segura v. United States, 468 U.S. 796 (1984); see generally Phillip A. Hubbart, Making Sense of Search and Seizure Law 344-345 (2005); Wayne LaFave, Search and Seizure 260-65 (4th ed. 2004).

This court has had no hesitation in applying the independent source rule where appropriate. For example, in State v. Mosier, 392 So. 2d 602 (Fla. 3d DCA 1981), we concluded that a search by plain clothes detectives of a suitcase checked by Mosier at a Continental Airlines ticket counter was lawful, despite the fact Mosier had earlier refused them permission to search the suitcase during the course of an illegal Terry stop.[6] Mosier, 392 So. 2d at 604. Although the detectives examined Mosier's flight ticket and utilized the claim check number obtained during the illegal encounter to verify the bag in the airport loading area, we held that so long as the bag would not have become inaccessible in the loading area in

_____

[6] Terry v. Ohio, 392 U.S. 1 (1968).

the ordinary course while the warrant was being obtained (e.g., taken to and loaded on the airplane),[7] the ultimate search of the bag revealing two kilos of cocaine was valid because the suitcase was opened pursuant to a search warrant secured, using evidence legally discovered through the operation of an independent source: visual characteristics of the bag observed by the detectives in the possession of Mosier before he checked it at the ticket counter. Id. at 604-05. Thus, we held, "whether Mosier was previously 'stopped' or not, legally or illegally, [was] of no consequence." Id. at 604.

State v. Griffith, 500 So. 2d 240 (Fla. 3d DCA 1987), issued by this Court a few years after Mosier, provides an even more cogent example of the operation of the independent source rule. In Griffith, we concluded that the State had not one, but at least three alternative methods of discovering the identity of an underage victim of sexual battery and lewd assaults than the method Griffith contended was "a product of police illegalities." Id. at 245. There, a former employee of Griffith advised Miami police that Griffith was actively involved in photographing young girls in the nude in his office for pay. Id. at 241. The employee referred police to a coworker for additional details. Id. Based upon this investigation, the police obtained a warrant to search Griffith's office and seized numerous photographs of nude young girls from a file cabinet. Id. Y.B. was featured in some of these

[7] Because the evidence was insufficient in this point, we remanded the case for further proceedings, solely on the seizure issue.

photographs. Id. Police also seized an address book which contained a listing for Y.B.'s mother. Id. Griffith was arrested and advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Id.

When Griffith expressed reluctance to consent to a search of his home, the police responded by threatening to get a search warrant and suggesting that Griffith's dog would have to be destroyed if it interfered with their entry and search. Id. Griffith signed a consent to search form. Id. The ensuing search yielded three photographs, two of which were of Y.B. and one of an adult female. Id. At the time the photographs were seized, police were not aware of the identities of any of the subjects of the photographs. Id.

Griffith was subsequently transported to the police station where he was again Mirandized and asked to sign a waiver form for purposes of questioning. Id. Griffith signed his initials by each paragraph of the form except the paragraph stating, "I am willing to answer questions asked of me." Id. Despite Griffith's failure to approve the paragraph regarding questioning, Detectives Judith Turner and Oscar Sanchez proceeded to interrogate him. Id. Griffith identified the woman's photograph as his ex-wife, but denied knowing the girl's identity. However, when confronted with a picture of the girl sitting in his lap, Griffith said he knew the girl's mother, but refused to answer further questions. Id. at 241-242.

Detective Callejas began an investigation to ascertain the identity of the young girl. Id. at 242. He first questioned Griffith's secretary, who gave him the name and occupation of Griffith's ex-wife. Id. Griffith's ex-wife was unable to identify the juvenile, but referred to Mrs. B. as an individual who might be able to identify the girl. Id. Detective Callejas then checked the listing for Mrs. B. in the address book secured from Griffith's office and contacted her. Id. Ms. B. identified the girl as her daughter, Y.B., who at the time was fifteen-years old. Id. After interviewing Y.B. and obtaining an affidavit from her detailing the acts committed by Griffith, Griffith was charged with eight counts of sexual battery and nine counts of lewd assault. Id.

In his motion to suppress evidence, statements and witness testimony, Griffith sought suppression of (1) items seized from his office; (2) items seized from his home; (3) statements made by Griffith at the police station; and (4) the testimony of Y.B. Id. After an evidentiary hearing, the trial court ruled that the search of Griffith's office pursuant to the search warrant was valid, the search of the house was unlawful, that Griffith's statements were elicited in violation of his Miranda rights; and the testimony of Y.B. was "a derivative product of police illegalities." Id. The trial court granted Griffith's suppression motion as to the evidence seized from his home, the statements made at the police station, and the testimony of Y.B. Id.

19

The narrow issue on appeal was whether the trial court properly deemed the testimony of Y.B. a derivative fruit of police misconduct.  Id.  Griffith argued that because the pictures found during the illegal search of the home were utilized to question him, and during the illegal questioning he provided the police with the name of his ex-wife, the identification and testimony of Y.B. was the direct product of the two illegalities.  Id.   After an exhaustive review of the exceptions to the exclusionary rule,[8] we found the illegal search of the home and unlawful questioning of Griffith to be of no consequence.  We reasoned:

> In the instant case the police had at least three alternative methods which would have led to the identity of Y.B. apart from the illegal search of Griffith's home and his improper interrogation. As the state correctly posits, it could have learned Y.B.'s identity in the following ways. First, by questioning Iris Rodriguez, the police learned the name and occupation of Griffith's ex-wife, Terry Macannon, thereby rendering Griffith's revelation of his ex-wife's identity through the photograph seized from his home merely gratuitous. Since Terry Macannon provided the link to Mrs. B. and hence to Y.B., the police already had a legitimate method of reaching Terry Macannon. Next, the state points out that, in the course of a regular police investigation of Griffith, the existence of Griffith's ex-wife would have come to light and the trail to Y.B. would have been uncovered. The last alternative by which the police could have found Y.B. concerns the address book and photograph of Y.B. taken from Griffith's office

---

[8] It is commonly stated that there are three exceptions to the otherwise harsh natural workings of the exclusionary rule.  Evidence otherwise excludable under the rule may nevertheless be admitted if the State can show that (1) an independent source existed for the discovery of the evidence, Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920); (2) the evidence would have inevitably been discovered in the course of a legitimate investigation, Nix v. Williams, 467 U.S. 431 (1984); or (3) sufficient attenuation existed between the challenged evidence and the illegal conduct, Wong Sun v. United States, 371 U.S. 471 (1963).

under a valid search warrant. By showing the photograph to each person listed in the address book, the police would have ultimately approached Mrs. B. as one of the entries in the book. Mrs. B. would have identified her daughter's photo and afforded the police access to Y.B.

Id. at 245 -246.

Finally, we find Jackson v. State, 1 So. 3d 273 (Fla. 1st DCA 2009), to be instructive on the facts of our case. As in the Griffith case, the illegal police activity in Jackson emanated from improprieties occurring where courts uniformly give the greatest degree of Fourth Amendment scrutiny, a person's residence. In Jackson, two police officers, acting on information provided by a burglary victim that Jackson was the perpetrator, pointed out his mother's home, where it was thought Jackson could be found. Id. at 276. The officers followed a trail of footprints from the burglary victim's home to Jackson's mother's home where they observed Jackson standing very still in an open shed. Id. Believing Jackson was attempting to escape their notice, the officers approached Jackson, and after he lied to them about his name, arrested him for giving a false name. Id. A search of Jackson's person produced a crack pipe. Id. at 277. Because the arrest for giving a false name was unlawful, see DuBois v. State, 932 So. 2d 298, 299 (Fla. 2d DCA 2006) (stating the giving of a false name is not a crime unless it occurs during a lawful detention or arrest); see also § 901.36(1), Fla. Stat. (2007), the discovery of the crack pipe was the product of an illegal search. Id. Moments after Jackson's

arrest, however, Jackson's mother gave the officers consent to search the shed. Id. That search produced a shotgun taken in the burglary and some shotgun shells. Jackson was then arrested for armed burglary as well. Id.

Jackson moved to suppress all the physical evidence obtained by police during the encounter, as well as some statements he made to police after the unlawful arrest, on the basis that all the evidence was recovered after the illegal first arrest. Id. The trial court denied Jackson's motion in its entirety. Id. The First District Court of Appeal found that the statements made to police after the first arrest should have been suppressed because they were the fruit of the illegal arrest to which no exception applies. Id. at 279. However, the court found the discovery of the shotgun and shotgun shells did not result either directly or indirectly from Jackson's initial arrest and that the crack pipe would have been inevitably discovered by the officers through lawful means unrelated to the illegal arrest. Id. at 278. The court reasoned:

> [T]he mere fact that evidence is discovered after illegal conduct by a police officer is an insufficient basis for suppression. Instead, it must be contended that the evidence is "in some sense the product of illegal government activity." Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (quoting United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)). Even when a Fourth Amendment violation has occurred, evidence should be suppressed only if it "has been come at by exploitation of the illegality" and was not obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Id. at 278. Based upon these principles, the court determined that the items found in the shed were admissible under the independent source exception to the exclusionary rule. Id. The State presented undisputed testimony that Jackson's mother, the owner of the property, gave consent to the officers to search the shed. Id. at 279. Thus, this court held, "even if [the officer] believed the arrest gave him justification for searching the shed, the consent from appellee's mother removed the taint of the arrest, making the shotgun and shells admissible at trial." Id. at 279.

As to the crack pipe, the First District Court of Appeal found it to be admissible under the inevitable discovery doctrine, a concept closely related to the independent source rule. Id. Unlike the independent source rule, which the First District explained "applies when evidence is discovered as a result of unlawful police activity but is also discovered independently through a lawful investigation that occurs either before or after the illegal activity, so long as the independent investigation [itself] is 'untainted by the initial activity,'" Id. at 278 (quoting Murray v. United States, 487 U.S. 533, 537 (1988)), under the inevitable discovery doctrine, "'evidence otherwise subject to suppression can be admitted if the State shows that the officers "ultimately would have discovered the evidence independently of the improper police conduct by 'means of normal investigative measures that inevitably would have been set in motion as a matter of routine

police procedure.'" Id. at 279 (citing McDonnell v. State, 981 So. 2d 585, 591 (Fla. 1st DCA 2008)). Based upon this principle, the First District Court of Appeal reckoned that "after finding the shotgun, the officers would have arrested [Jackson] for the burglary, and a search incident to arrest would have revealed the crack pipe, thus properly making it admissible at the trial of the case" while simultaneously finding that "[i]t would be too speculative to conclude [Jackson] would have provided the same incriminating statements to the officers if he had been arrested after the search of the shed." Id.

In Case No. 07-10526A before us, there is no need for speculation. It is not disputed Detective Orenstein detected the unmistakable smell of marijuana the moment Ojeda opened the door to the residence where he was found. Based upon that evidence and observations made during the second unlawful sweep of the house, Detective Orenstein obtained a warrant to search the house. The affidavit executed by Detective Orenstein to obtain the search warrant plainly stated that "'Upon knocking at the front door of 'The Premises[,]' Subject Ojeda answered the door, [and] Your Affiant could smell the odor of marijuana emanating from inside 'The Premises.'" This discovery occurred during the course of "a lawful investigation" conducted by Detective Orenstein to effect the arrest of Ojeda on another case before the occurrence of the illegal activity. The smell alone entitled Detective Orenstein to a warrant to search the premises. See State v. Roman, 103

24

So. 3d 922, 925-26 (Fla. 2d DCA 2012) (finding the smell of marijuana through an open door was sufficient to establish probable cause for a warrant); State v. Pereira, 967 So. 2d 312, 314 (Fla. 3d DCA 2007) (finding even without evidence of a dog sniff, an officer smelling marijuana from a house demonstrates sufficient probable cause to support the issuance of a warrant); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana"). As in Mosier, Griffith and Jackson, there existed an independent basis for the discovery of the contraband evidence. The independent source rule applies to purge the discovery of the evidence in this case from any illegal taint.

For these reasons, we reverse the order of the trial court in Case No. 07-10526A as well.

SUAREZ, J., concurs.

25

ROTHENBERG, J. (concurring in part, and dissenting in part).

I agree entirely with the analysis and conclusion in lower tribunal case number 05-37152.  As to case number 07-10526(A), the majority concludes that although the warrantless entry into the defendant's home was unlawful, the evidence ultimately seized pursuant to a valid search warrant was admissible based on the independent source and/or inevitable discovery doctrines.  While I agree with most of the majority's analysis and its conclusion that, under the independent source and/or inevitable discovery doctrines, the evidence was admissible, I disagree with the finding that the entry of the defendant's home was unlawful, and therefore respectfully dissent from that portion of the Court's opinion.

## Case No. 07-10526(A)

The majority concludes that the trial court erred in suppressing the evidence because sufficient probable cause existed to support issuance of the search warrant, and therefore, the evidence would have "inevitably been discovered."  I agree.  However, I would also find that the warrantless entry into the defendant's residence and the subsequent protective sweep of his house were lawful because the record reflects that, prior to the warrantless entry, law enforcement had probable cause to believe that contraband or evidence of a crime would be found in

26

the house and that exigent circumstances existed. Based on probable cause and exigent circumstances, a protective search was conducted, the occupants and the house were secured, and as the majority concedes, a search warrant was eventually obtained. Thus, the evidence that was subsequently seized was lawfully seized pursuant to a valid search warrant.

**The Evidence**

The record reflects that the defendant has an extensive criminal history. He is a known marijuana grower who, prior to his arrest in this case, had been arrested by Detective Orenstein for cultivating marijuana inside a house located at another location in Miami, Florida. The facts underlying that arrest are contained in the majority opinion under case number 05-37152. The defendant pled guilty to the charges in that case, and he was placed on probation.[9]

On March 13, 2007, while the defendant was on probation in case number 05-37152, the Miami-Dade Police Department received a call from the defendant's landlord, at 9187 S.W. 138th Place, reporting that the defendant's apartment contained a marijuana hydroponics lab. Detective Knapp responded to the call, and, after obtaining consent from the landlord, Detective Knapp searched the

---

[9] Although the defendant pled guilty to the charges in case number 05-37152 on January 13, 2006, the defendant filed, a motion to vacate his plea in that case **after** his arrests for similar charges in case numbers 07-10525 and 07-10526(A). The trial court granted the defendant's motion to withdraw his plea and subsequently suppressed the evidence in all three cases.

apartment and confirmed that it was in fact being used as a marijuana grow house. After ten days, when Detective Knapp was unable to locate the defendant to arrest him on probable cause, he decided to obtain an arrest warrant. However, on March 23, 2007, the day he intended to obtain the warrant, Detective Knapp received a call from Detective Orenstein stating that he had located the defendant. After Detective Orenstein's call, Detective Knapp responded to where Detective Orenstein had the defendant secured and arrested the defendant based on probable cause that the defendant was growing marijuana. The search and seizure relating to Detective Knapp's case is not an issue in this appeal.

The arrest of the defendant in case number 07-10526(A) occurred after the following. As discussed, Detective Orenstein knew the defendant because he had previously arrested the defendant for operating a marijuana grow house in case number 05-37152. Thus, when Detective Orenstein learned that Detective Knapp was trying to locate the defendant in reference to the marijuana cultivation operation in the apartment, Detective Orenstein drove by a house where he believed the defendant could be located—10195 S.W. 139th Place. When Detective Orenstein saw the defendant's truck parked in front of the house, he called Detective Knapp and informed him that he believed he had located the defendant.

Detective Orenstein called for back-up, and when Officer Benjamin arrived, he and Officer Benjamin approached the house and knocked on the front door. When the defendant opened the front door, Detective Orenstien, who was standing on the front porch, immediately smelled the odor of marijuana emanating from inside the house. Because Detective Orenstein had seen a second vehicle parked directly behind the defendant's truck, he asked the defendant if there was anyone else in the house. The defendant responded that there was someone inside, but when Detective Orenstein asked the defendant who it was, the defendant responded, "oh, no, there is nobody here."

As he was talking to the defendant, Detective Orenstein testified he heard a door slam in the house. Detective Orenstein stepped into the foyer, secured the defendant, and while Officer Benjamin maintained control over the defendant, Detective Orenstein headed in the direction of the slamming door, announced his presence, and ordered the occupants to come out. When there was no response to his command, Detective Orenstein proceeded to the general area where he heard the door slam and discovered Mr. Perez in a bathroom. After taking Perez into custody, Detective Orenstein called for additional back-up to secure the defendant and Perez so that Detective Orenstein could sweep the remainder of the house. When additional back-up arrived, Detective Orenstein and Officer Benjamin continued the security sweep of the house, where they observed marijuana

29

paraphernalia, a large quantity of small marijuana plants in a bedroom, and a marijuana hydrophonics lab in the garage. After concluding the security sweep of the house, Detective Orenstein asked the defendant for consent to search the house. When the defendant did not consent, Detective Orenstein obtained and served a search warrant, which resulted in the seizure of fifty-three pounds of marijuana found in the garage and eighty-four young marijuana plants found in a bedroom. After the defendant was arrested by Detective Orenstein, Detective Knapp responded to the scene and arrested the defendant on his case involving the marijuana hydroponics laboratory found in the apartment.

**The trial court erred in suppressing the evidence**

The entry onto the defendant's property, the initial entry into the defendant's house, and the subsequent protective search were all lawful.

The Fourth Amendment is implicated only when the government invades an area in which a person entertains a legitimate or justifiable expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143 (1978); Terry v. Ohio, 392 U.S. 1, 9 (1968); Katz v. United States, 389 U.S. 347, 353 (1967). Although the Fourth Amendment protects people, not places, it is still necessary to consider the nature of the place in which legitimate privacy expectations are being asserted. Katz, 389 U.S. at 361 (Harlan, J., concurring).

As the majority recognizes, when the officers entered the defendant's property, which was open to the public, and knocked at his front door, the Fourth Amendment was not implicated. When the defendant voluntarily opened the door, and the officers, who were aware of the defendant's history of operating marijuana grow houses, smelled the marijuana, they clearly had probable cause to arrest the defendant and to search the house. Although a warrantless entry to arrest the defendant and to search the house would not be constitutionally permissible on probable cause alone, where, as here, exigent circumstances existed, the seizure of the defendant and the protective sweep conducted were lawful. The evidence seized was as a result of a valid search warrant obtained after the premises and the occupants of the house were secured. And, as the majority recognizes, even if the seizure of the defendant and the protective sweep of the house were unlawful, the evidence seized would have been inevitably discovered by lawful means. Thus, suppression of the evidence is error.

## The officers' presence at the defendant's front porch and the knock on the defendant's front door did not implicate the Fourth Amendment

The law is clear in Florida that the officers' presence on the defendant's front porch, knock on the defendant's front door, and conversation with the defendant while standing on the porch outside of the defendant's residence did not implicate the Fourth Amendment and did not require probable cause, reasonable suspicion, or a warrant. The officers' presence on the defendant's porch was

31

therefore lawful. As the Florida Supreme Court specifically held in <u>State v. Morsman</u>, 394 So. 2d 408, 409 (Fla. 1981), "[u]nder Florida law it is clear that one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time." Similarly, in <u>Davis v. United States</u>, 327 F.2d 301, 303 (9th Cir. 1964), the Ninth Circuit Court of Appeals held:

> [T]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

In <u>State v. Triana</u>, 979 So. 2d 1039 (Fla. 3d DCA 2008), this Court held that "a knock on the door and subsequent discussion is a purely consensual encounter, which officers may initiate without any objective level of suspicion," and "[t]he fact that a consensual encounter takes place at the entrance of an individual's home does not call into question or in any way lessen the propriety of a consensual encounter." <u>Id.</u> at 1043; <u>see also</u> <u>State v. Periera</u>, 967 So. 2d 312, 314 (Fla. 3d DCA 2007) ("We follow those cases which hold that there is no reasonable expectation of privacy at the entrance of property which is open to the public, including the front porch."); <u>United States v. Cruz-Mendez</u>, 467 F.3d 1260, 1264 (10th Cir. 2006) ("[A] 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."); <u>United States v. Cormier</u>, 220 F.3d 1103, 1109 (9th Cir. 2000) ("[N]o suspicion

32

needed to be shown in order to justify the 'knock and talk.'").

The Second District Court of Appeal in Nieminski v. State, 60 So. 3d 521 (Fla. 2d DCA 2011), examined whether law enforcement may open a closed but unlocked gate and walk to the front door of a house to engage in a "knock and talk." The court concluded that "a citizen's encounter, including a knock and talk, is not regarded as a search or seizure," id. at 526 but rather, it is "a purely consensual encounter, which officers may initiate without any objective level of suspicion." Id. at 527 (quoting Hardin v. State, 18 So. 3d 1246, 1247 (Fla. 2d DCA 2009)). The court also found that absent a "no trespassing" sign or similar warning that the fence and gate were intended to keep people out, the officers may enter onto property without violating the Fourth Amendment. Id.; see also Bennett v. City of Eastpointe, 410 F.3d 810, 821 (6th Cir. 2005) ("A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment."); Murphy v. State, 898 So. 2d 1031, 1032 n.4 (Fla. 5th DCA 2005) (recognizing that a "knock and talk" conducted at Murphy's motel room is a procedure used by law enforcement as an investigative tool where there is no need for probable cause or a warrant).

In order to initiate a "knock and talk," there is no requirement that law enforcement must be investigating a possible crime being committed on the premises. Because a knock and talk is not based on probable cause or even

reasonable suspicion, no citizen complaint or tip from an informant is required. In

State v. Navarro, 19 So. 3d 370, 373-74 (Fla. 2d DCA 2009), the Second District

Court of Appeal reversed the trial court's order suppressing evidence of a grow

house where the "knock and talk" was based on nothing more than a hunch. The

Second District found that "the circuit court's conclusion that a knock and talk

cannot be based on a hunch and must stem from a tip or complaint finds no support

in the case law." Id. at 373. Specifically, the Second District held:

> The circuit court's ruling conflicts with the proposition that police
> officers may approach a residence and speak to the residents just as
> any private citizen may. Thus, the circuit court fell into error when it
> ruled that the knock-and-talk encounter at issue in this case amounted
> to illegal police conduct.

Id.

However, as this Court and others have recognized, a "knock and talk"

consensual encounter may evolve into a "constructive entry" when the police,

while not entering the house, use tactics that essentially force the occupant out of

the house. Triana, 979 So. 2d at 1044. As to what constitutes constructive entry,

the court explained:

> Constructive entry has been found when a suspect emerged from a
> house "in response to coercive police conduct." United States v.
> Morgan, 743 F.2d 1158, 1166 (6th Cir. 1984). Coercive police
> conduct occurs where there is "such a show of authority that [the]
> Defendant reasonably believed he had no choice but to comply."
> United States v. Saari, 272 F.3d 804, 809 (6th Cir. 2001).
>  [However, t]he presence of police officers alone, absent any
> indication of coercive words or acts, misrepresentation, deception, or

trickery is insufficient to raise an inference of submission to police authority.

Id. (first alteration in original).

The question of whether the show of force exhibited by the police elevates a consensual encounter to a non-consensual encounter rests on various factors, including the number of officers present and where they were positioned during the encounter; whether any weapons were drawn; whether there were any coercive actions, demands, or raised voices; and the time of the day or night.  Id. at 1044-45.  For example, although the initial knock and talk in Hardin was found lawful, the length of the encounter and the subsequent intimidation of the occupants was found to have vitiated the consent to search granted during the encounter.  18 So. 3d at 1250.  Similarly, in Luna-Martinez v. State, 984 So. 2d 592, 598-99 (Fla. 2d DCA 2008), the Second District Court of Appeal held:

> The key to the legitimacy of the knock-and-talk technique—as well as any other technique employed to obtain consent to search—is the absence of coercive police conduct, including any express or implied assertion of authority to enter or authority to search.  In properly initiating a knock-and-talk encounter, the police should not "deploy overbearing tactics that essentially force the individual out of the home."  United States v. Thomas, 430 F.3d 274, 277 (5th Cir. 2005).  Nor should "overbearing tactics" be employed in gaining entry to a dwelling or in obtaining consent to search.

Clearly, when Detective Orenstein and Officer Benjamin initially entered the defendant's property, which was not gated and was thus open to the public, approached and knocked on the defendant's front door, and the defendant opened

the door to speak with the officers, the encounter was a consensual encounter. Only two officers were present, they were in plain clothes, no guns were drawn, it was daytime, the officers did not have a drug sniffing canine with them, and no coercive tactics were used to force the defendant to open the door. Thus, the initial encounter did not implicate the Fourth Amendment, and it was lawful.

**Probable cause was established during the initial encounter**

When the defendant opened the front door to speak with the officers, the officers immediately smelled the odor of marijuana coming from inside the house. Detective Orenstein is an experienced law enforcement officer trained in the detection of narcotics who has investigated over one hundred marijuana cases. Additionally, the defendant's residential marijuana cultivation business was well known to Detective Orenstein because he had previously arrested the defendant for operating a marijuana grow house in roughly the same neighborhood. Detective Orenstein also knew that Detective Knapp was looking for the defendant to arrest him for operating a grow house in an apartment the defendant was renting close by. Thus, it is clear, and the defendant does not dispute, that prior to any entry into the house, the officers developed probable cause unrelated to Detective Knapp's case.

**The warrantless entry and protective sweep were based on exigent circumstances**

The majority holds that the warrantless entry into the defendant's residence

and the protective sweep conducted by Detective Orenstein were unlawful. I disagree. Although a basic principle of the Fourth Amendment is that searches and seizures inside a home without a warrant are presumptively unreasonable, <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980), the United States Supreme Court has recognized that this presumption may be overcome in some circumstances because the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1856 (2011) (quoting <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006)).

**<u>Seizure of the defendant and the warrantless protective sweep of the house were lawful</u>**

As Justice Black stated in <u>Vale v. Louisiana</u>, 399 U.S. 30, 36 (1970) (Black, J., dissenting):

> The Fourth Amendment to the United States Constitution prohibits only "unreasonable searches." A warrant has never been thought to be an absolute requirement for a constitutionally proper search. Searches, whether with or without a warrant, are to be judged by whether they are reasonable, and, as I said, speaking for the Court in <u>Preston v. United States</u>, 376 U.S. 364, 366-367, 84 S. Ct. 881, 882-883, 11 L. Ed. 2d 777 (1964), common sense dictates that reasonableness varies with the circumstances of the search. <u>See, e.g.</u>, <u>Henry v. United States</u>, 361 U.S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959).

(footnote omitted).

"Accordingly, the warrant requirement is subject to certain reasonable exceptions." <u>King</u>, 131 S. Ct. at 1856. One well-recognized exception is the

existence of exigent circumstances.  Id.  A warrantless entry, therefore, may be justified where there exists both probable cause and exigent circumstances.  United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983); Mercier v. State, 579 So. 2d 308, 309 (Fla. 3d DCA 1991) ("A warrantless entry must be justified by probable cause and exigent circumstances.").

In the present case, the warrantless entry was lawful, as it was based on probable cause and exigent circumstances.  The officers had lawfully entered onto the defendant's unfenced property and knocked on the defendant's front door. When the defendant opened the door, the officers smelled marijuana, which supplied the probable cause to arrest the defendant on drug charges separate from the crimes that brought the officers to the defendant's home in the first place. Then, based on the exigent circumstances, the officers lawfully secured the defendant and conducted a  protective security sweep of the house prior to obtaining a warrant.  The exigent circumstances were based on the second vehicle parked behind the defendant's vehicle; the defendant's contradictory answers regarding whether there was anyone else in the house (first he said yes and then he said no); hearing a door slam within the house; the nature of narcotics which can be easily destroyed; and the possibility that someone in the house could present a danger to the officers.

The risk of removal or the destruction of narcotics has long been recognized as an exigent circumstance obviating the need to obtain an arrest or search warrant. See United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973). As the Supreme Court noted in King, "[d]estruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain." King, 131 S. Ct. at 1857; see also U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (holding that in narcotics cases, "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed" (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990))).

Whether exigent circumstances existed is evaluated based on the totality of the circumstances. Seibert v. State, 923 So. 2d 460, 468 (Fla. 2006). The test is an objective one and the "appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe the evidence might be destroyed before a warrant could be secured." Tobin, 923 F.2d at 1510 (quoting U.S. v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987)).

In the instant case, the warrantless entry, seizure of the defendant, and the protective sweep were all lawful based on probable cause and exigent circumstances. The officers had probable cause to believe the defendant was

growing and/or storing marijuana in the house. The odor of marijuana emanating from the house and onto the front porch when the defendant opened the front door was strong enough to be easily detected by Detective Orenstein's ordinary sense of smell. Detective Orenstein had previously arrested the defendant for operating a marijuana grow house, and on that very same day, Detective Knapp intended to obtain a warrant for the defendant's arrest for a separate marijuana cultivating operation. Additionally, the defendant gave conflicting answers when asked if there was anyone else in the house. First, he said there was someone in the house, and then he maintained there was not. The defendant's claim that there was no one else in the house justifiably elevated Detective Orenstein's concern that the evidence might be destroyed because he had observed a second vehicle parked behind the defendant's truck and heard a door slam while he was talking to the defendant—clearly indicating that the defendant was not alone in the house—and the defendant, who had previously been arrested by the same detective, knew the detective was aware of his criminal past and had smelled the marijuana in the house. Under these circumstances, a reasonable, experienced officer would be justified in his belief that some of the evidence might be destroyed before a warrant could be secured.

This conclusion is amply supported by case law. The facts in <u>Tobin</u> are similar to the facts in this case. While conducting a surveillance in the

neighborhood of co-defendant Ackerson's house, the agents observed Tobin approach Ackerson's house, engage in suspicious behavior, and then enter the house through the garage. The agents decided to investigate. They knocked at the front door, Ackerson opened the door, and, while the agents were speaking with Ackerson, they smelled marijuana coming from the inside the house. When the agents told Ackerson what they had observed—the suspicious off-loading of bags into the garage—Ackerson denied the activity had occurred and denied that anyone else was in the house. Ultimately, the agents arrested Ackerson and conducted a warrantless search of the house.

The Eleventh Circuit held that the initial discussion between Ackerson and the agents was a consensual encounter; the odor of marijuana coming from inside the house gave rise to probable cause; and, based on the presence of three vehicles on the scene and Ackerson's false responses about Tobin's presence, exigent circumstances existed justifying the warrantless protective sweep of the house. "[T]he defendants and anyone else who might have been present in the house would have been aware of the agent's suspicions at that moment. Danger that the defendants or someone else inside the house might destroy the evidence thus provided the exigent circumstances required to justify a warrantless search." Tobin, 923 F.2d at 1512.

Also instructive is <u>Gilbert v. State</u>, 789 So. 2d 426 (Fla. 4th DCA 2001).  In

<u>Gilbert</u>, the Fourth District noted that "[e]xigent circumstances are one exception

to the warrant requirement.  While there is no exhaustive list of what constitutes

exigent circumstances to permit a warrantless entry of a constitutionally protected

space, imminent destruction of evidence is one such circumstance."  <u>Id.</u> at 428

(citing <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984)).  Applying this standard,

the Fourth District concluded that exigent circumstances existed, stating:

> [W]e have no difficulty in determining that the facts were such as to lead a reasonable police officer to believe that the evidence would have been destroyed before a warrant could be obtained.  The officers were dispatched to appellant's motel room, not on a suspicion of narcotics but by a call that the occupant of the room wished to surrender on other warrants.  Appellant opened the door, allowing the officers to see the contraband that was only two to three feet from the door. Obviously, appellant also became aware that the officers viewed the contraband, and **under any objective view of the facts the officers acted reasonably in immediately entering and seizing the contraband before appellant had the opportunity to dispose of it**.

<u>Id.</u> at 429 (emphasis added).

As these cases demonstrate, whether exigent circumstances exist is an

objective test based on the totality of the circumstances, including that drugs are

easily destroyed when the occupants of a residence are alerted to the presence of

law enforcement who by sight or smell have probable cause to obtain a warrant.

Under the facts of this case, it was reasonable for an experienced officer to believe

that the evidence might be destroyed before a warrant could be secured.  Thus, the

warrantless entry and protective sweep of the residence were lawful.

Based on the exigent circumstances, the defendant was taken into custody, a protective sweep was conducted, and a search warrant was obtained. The officers would not have had the lawful authority to enter absent a warrant if the defendant had not opened the door to speak with the officers (which he was legally free to refuse to do), the officers had not smelled the marijuana, and the defendant had not given contradictory answers about who was in the house.

**Inevitable discovery**

As already demonstrated, the officers' warrantless entry and protective sweep of the residence, which were based on probable cause and exigent circumstances, were lawful. However, even if they were not, I agree with the majority that the inevitable discovery rule protects the evidence from suppression.

In Nix v. Williams, 467 U.S. 431, 444 (1984), the United States Supreme Court adopted the inevitable discovery rule, which allows evidence obtained as the result of unconstitutional police procedure to be admitted if the evidence would ultimately have been discovered by legitimate means. See also Moody v. State, 842 So. 2d 754, 759 (Fla. 2003) (discussing the inevitable discovery doctrine). Further, in Jeffries v. State, 797 So. 2d 573, 578 (Fla. 2001), the Florida Supreme Court noted that "[i]n order to apply this doctrine, there does not have to be an absolute certainty of discovery, but rather, just a reasonable probability." Jeffries,

797 So. 2d at 578 (citing United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980)).

In Segura v. United States, 468 U.S. 796, 798 (1984), the United States Supreme Court held that where law enforcement has probable cause to believe that evidence of criminal activity is on the premises, they may secure the premises while a search warrant is being obtained. The Court reasoned that because the evidence would inevitably have been discovered, as it was, upon execution of the valid search warrant, the trial court erred in suppressing the evidence. The following are decisions from the various Florida District Courts of Appeal which have applied the inevitable discovery doctrine.

In Mercier v. State, 579 So. 2d 308 (Fla. 2d DCA 1991), law enforcement officers, who had the defendant's apartment under surveillance, sent a buyer to the apartment to purchase cocaine. After the purchase, armed with probable cause but without a warrant, the officers entered the apartment, seized the defendant and the premises, and occupied the defendant's home for fifteen hours while they obtained a warrant. That law enforcement had probable cause was not in doubt. The issue, however, was whether the circumstances constituted exigent circumstances. The Second District ultimately concluded that whether the warrantless entry was justified based on probable cause and exigent circumstances was "not relevant to the admissibility of the challenged evidence [because h]aving been seized under a

warrant with a basis independent of the entry, the evidence was admissible." Id. at 309. In reaching this conclusion, the Second District specifically relied on Segura, 468 U.S. at 813-14, which held that evidence seized pursuant to a valid search warrant that is based on information known to police before the illegal entry and that is wholly unrelated to entry is not tainted. Mercier, 579 So. 2d at 309.

Numerous decisions have likewise found evidence obtained after unconstitutional police actions admissible under the inevitable discovery doctrine. See Cummings v. State, 956 So. 2d 559, 560 (Fla. 5th DCA 2007) (holding that the evidence was admissible under the inevitable discovery doctrine, as that doctrine "requires the state to establish by a preponderance of the evidence that the police ultimately would have discovered the evidence independently of the improper police conduct by 'means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure'" (quoting Craig v. State, 510 So. 2d 857, 863 (Fla. 1987))); Carter v. State, 868 So. 2d 1276, 1278 (Fla. 4th DCA 2004) (declining to address whether the stop was lawful where there existed a reasonable probability that the evidence would have inevitably been discovered through lawful means); Conner v. State, 701 So. 2d 441, 443 (Fla. 4th DCA 1997) (finding that the trial court properly applied the inevitable discovery doctrine and "the state carried its burden of establishing by a preponderance of the evidence that the contents of the safe would have inevitably been discovered in the

45

course of a legitimate investigation"); State v. Ruiz, 502 So. 2d 87, 87 (Fla. 4th DCA 1987) (reversing the trial court's order suppressing the evidence and concluding that the evidence should have been admitted under the inevitable discovery doctrine).

In the instant case, the evidence was seized pursuant to a valid search warrant, not during or as a result of the protective sweep conducted by the officers. Since probable cause existed prior to any allegedly unconstitutional conduct, it is clear that the evidence seized during the execution of the search warrant inevitably would have been discovered had the officers secured the residence and waited for the issuance of the warrant prior to conducting the protective sweep of the residence. While the warrantless entry was lawful in order to secure the premises, the legality of the initial entry has no bearing on whether the evidence first discovered during the protective sweep of the residence that was later seized pursuant to a valid search warrant was lawful. See Segura, 468 U.S. at 798-99.

In Segura, the agents knocked at the apartment door, Ms. Colon answered, and they entered Segura's apartment without requesting or receiving permission. Id. at 800. The agents then conducted a limited security check of the apartment to ensure that no one else was there who might pose a threat to their safety or destroy evidence. Id. During their sweep of the premises, they observed, in a bedroom in plain view, various accoutrements of drug trafficking. Id. at 801. None of the

46

items was disturbed by the agents. Id. Ms. Colon was arrested, and two agents remained in the apartment while a search warrant was obtained. Id. Upon execution of the search warrant, various items found during the search, as well as those items observed during the security check, were seized. Id. The trial court and the court of appeals determined that the initial warrantless entry and security sweep were not justified by exigent circumstance and were therefore unlawful. Id. at 803. The government did not challenge that finding. Id. Thus, the sole issue addressed by the Supreme Court was whether the evidence seized pursuant to the search warrant should be excluded as "fruit" of the illegal police conduct. Id.

First, the Court noted that where law enforcement officers have probable cause to believe that evidence of criminal activity is on the premises, it does not violate the Fourth Amendment to secure the premises to preserve the status quo while a search warrant is sought. Specifically, it stated that "'unless there is some kind of power to prevent removal of material from the premises, or destruction of material during this time, the search warrant will almost inevitably be fruitless.'" Id. at 809 n.7 (quoting Erwin N. Griswold, Criminal Procedure, 1969—Is It a Means or an End?, 29 Md. L. Rev. 307, 317 (1969)). Additionally, the Court found no distinction between securing the premises from within or from outside of the residence, as in either case, it interferes with the possessory interests of the owners to the same extent. Id. at 798. Thus the Court held:

> [W]here officers, having probable cause . . . arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

Id.

Additionally, the Court found that, assuming there was an illegal entry, suppression of the evidence was only required if the initial entry tainted the discovery of the evidence challenged. Id. at 799. In answering this question, the Court held that "the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry. . . ." Id. at 799.

The facts in the instant case lead to the same conclusion. Regardless of whether the initial entry and protective sweep were lawful, the evidence seized pursuant to a valid search warrant would inevitably have been found absent any unlawful police conduct. Because Detective Orenstein had probable cause to believe the residence contained evidence of illegal drug activity prior to any entry, he could have obtained, and did obtain, a valid search warrant. While waiting for the issuance of the warrant, he had the legal right to secure the premises. Because the evidence seized in executing the search warrant was based on probable cause developed prior to entry of the residence and absent any illegal police conduct, it

was lawfully seized.  The suppression of the evidence was therefore error, and I accordingly agree with the majority that the trial court's order suppressing the evidence must be reversed.